Charles LANGONE, Fund Manager of the New England Teamsters and Trucking Industry Pension Fund, Plaintiff,

v.

C. WALSH INC.; Metromove, Inc.; and William Walsh Inc., d/b/a William Walsh Movers, Defendants.

Rodney G. SMITH, Executive Director, Teamsters 25 Health Services and Insurance Plan, Plaintiff,

v.

C. WALSH INC.; Metromove, Inc.; and William Walsh Inc., d/b/a William Walsh Movers, Defendants.

Civ. A. Nos. 91–13289–Z, 91–13284–Z.

United States District Court, D. Massachusetts.

July 1, 1994.

Grady & Dwyer, P.C., Boston, MA, for plaintiffs.

Maria E. Recalde, Paul E. Stanzler, Burns & Levinson, Boston, MA, for defendants.

Margery E. Lieber, Deputy Asst. Gen., Counsel for Sp. Litigation, N.L.R.B., Washington, DC, for interested party.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

These actions were brought on behalf of the New England Teamsters and Trucking Industry Pension Fund (the "Pension Fund") and the Teamsters 25 Health Services and Insurance Plan (the "Health Fund") for unpaid employer contributions. In addition, the Pension Fund seeks withdrawal liability and equitable relief under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") which amended the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs claim that C. Walsh Inc. ("CWI") owes the Funds for unpaid contributions and/or withdrawal liability, and William Walsh Inc. ("WWI"), is also liable as CWI's alter ego or co-employer.[1] The essential facts are largely stipulated and both parties move for summary judgment.

Plaintiff Charles Langone is Fund Manager of the Pension Fund, a "multi-employer plan" and an "employee benefit plan" under ERISA.[2] Plaintiff Rodney G. Smith is Executive Director of the Health Fund, which is an "employee welfare benefit plan" and an "employee benefit plan" under ERISA.[3]

Defendant CWI is a Massachusetts corporation, incorporated in 1959, which was in the general moving, trucking and transportation business. It ceased operations on June 12, 1991. CWI was a signatory to Declarations of Trust and Participation Agreements with the Funds as well as a party to collective bargaining agreements with Teamsters Local Union 82 (the "Union"), under which it was obligated to contribute to the Funds during all material times until June 1, 1991. These contracts authorized the Funds to conduct audits of CWI's payroll and wage records. Two such audits (Audit No. 2225 and Audit No. 9091) revealed that CWI was delinquent

---

1. In addition, the Pension Fund claims that CWI, Trafalgar Square and Trafalgar West Realty Trusts are under "common control" and thus a single employer for purposes of withdrawal liability under the MPPAA. I dismissed this count on August 26, 1993. Plaintiff has moved to amend its complaint to cure the defects that lead to dismissal. I consider that motion separately.

2. 29 U.S.C.A. §§ 1002(3), (37)(A) (West 1994).

3. 29 U.S.C.A. §§ 1002(1), (3) (West 1994).

in its contributions to the Funds. In addition, this Court's Default Judgment[4] ordered CWI to pay the Pension Fund $44,005.14 in other unpaid contributions plus interest.

On June 1, 1991, CWI "withdrew" from the Pension Fund within the meaning of the MPPAA.[5] The Pension Fund duly notified CWI of its $243,737.00 withdrawal liability, but CWI has failed to pay any portion of that obligation.

Thomas R. Walsh is the principal officer and shareholder of CWI. During various periods since 1980 he served as CWI's chief executive officer and/or president.

WWI was incorporated under the laws of Massachusetts on April 23, 1990. It, too, is engaged in trucking, moving and transportation. Like CWI, it is obligated to make monthly contributions to the Health and Pension Funds under Declarations of Trust, Participation Agreements and collective bargaining agreements. William F. Walsh is the sole officer and shareholder of WWI. He had once served as president of CWI but resigned that position to work full-time as WWI's president and chief executive officer.

Metromove, Inc. was a Massachusetts corporation whose primary purpose was to operate a trucking, moving and transportation business. Although Metromove had offices at 250 Elm Street, Dedham, Massachusetts, from 1985 to 1990, it conducted no business and had no employees. Its sole officer and shareholder was William F. Walsh. It was dissolved on December 31, 1990.

According to plaintiffs, WWI, as CWI's alter ego, is liable for all the latter's unpaid obligations. They also claim that WWI, CWI and Metromove are a "single employer," responsible for each others' debts. Defendants contend that WWI's collective bargaining agreement terminated any prior obligations it may have had to the Funds. They also dispute plaintiffs' claims regarding alter ego and single-employer liability.

Standard for Summary Judgment.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fed.R.Civ.P. 56*. The facts are viewed in the light most favorable to the party opposing the motion. *Continental Casualty Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). Because there are no factual disputes in this case, it is appropriate for summary judgment.

CWI's Liability.

    (1) Civil Action No. 91–13289–Z: Counts I, III and VII

    (2) Civil Action No. 91–13284–Z: Count I

As a preliminary matter, defendants do not dispute plaintiffs' claims that CWI is liable in its own right to both Funds for delinquent contributions according to the default judgment of July 3, 1991 and the payroll audits of April 18 and October 8, 1991. Nor do they dispute that CWI is liable to the Pension Fund for the withdrawal liability payments. Accordingly, plaintiffs are entitled to the delinquent contributions and withdrawal liability, interest thereon, liquidated damages, and reasonable attorney's fees as provided in 29 U.S.C.A. §§ 1132(g)(2), 1145 (West 1984).

WWI's Liability (WWI's Collective Bargaining Agreement).

WWI signed a collective bargaining agreement with the Union on July 25, 1991. According to WWI, this agreement set forth the entirety of its obligations to the Funds. It contends that plaintiffs' alter ego and single-employer claims seek to impose more than one contract on WWI, holding it responsible for its present obligations under the collective bargaining agreement as well as for the contractual terms of the expired agreements between the Union, the Funds

---

**4.** Order entered in Civil Action No. 91–10001–Z, July 3, 1991.

**5.** 29 U.S.C.A. §§ 1381, 1383 (West 1985).

and CWI.[6] Defendants argue that this result would chill management's incentive to settle labor disputes or bargain with employee representatives.

Defendants fail, however, to present any evidence that the parties entered into the collective bargaining agreement with the intent to settle all disputes between WWI and the Funds. No such intent is evident from the terms of the agreement itself. The agreement is a contract between the Union and WWI, which defines WWI's *prospective* obligations to the Union. It does not touch on CWI's past obligations to the Funds. Moreover, although the collective bargaining agreement requires WWI to pay into the Funds, the Funds themselves were not a party to the agreement. William Walsh does not contend that it was his intention to negotiate freedom from liability when WWI entered into the Union contract. In fact, he states that he had "no knowledge of such [withdrawal] liability." Walsh Aff., ¶ 19. Defendants also present the deposition of John J. Perry, the Union representative who negotiated the contract with WWI, and who testified that there was no negotiation with respect to WWI's obligation to pay CWI's debts; the topic never came up. Past obligations of CWI to the Funds are a matter wholly outside the scope of the collective bargaining agreement between WWI and the Union. Thus, if those obligations were to be terminated, at least to the extent of any possible liability of WWI, the contract must have explicitly so provided. Because defendants have not raised an issue of fact as to the parties' intent, this argument fails.

Alter Ego Liability.

(1) Civil Action No. 91–13289–Z: Counts II, IV and IX

(2) Civil Action No. 91–13284–Z: Count II

■ Plaintiffs claim that WWI is the alter ego of CWI, established to escape CWI's responsibilities to its employees and the Pension and Health Funds. Alter ego analysis focusses on "the existence of a disguised continuance of a former business enti-

ty or an attempt to avoid the obligations of a collective bargaining agreement." *Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 24 (1st Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). Although the alter ego inquiry is particularly common in the context of successor employers, there is also precedent for its use where the companies are not successors but rather parallel operations. *C.E.K. Indus. Mechanical Contractors v. NLRB*, 921 F.2d 350, 354 (1st Cir.1990) (cases are collected). A finding that one employer is the alter ego of another will bind the nonsignatory to a collective bargaining agreement between a union and its alter ego. *Penntech*, 706 F.2d at 24.

■ The First Circuit examines several factors in its determination of alter ego status: substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership. *C.E.K.*, 921 F.2d at 354. Anti-union animus is also a critical factor, and distinguishes the "single-employer" from the "alter ego" analysis. *Id.* No single factor controls and all need not be found to support a finding of alter ego status. *Id.*

Business Purpose, Operation and Customers.

The parties agree that the primary purpose of both CWI and WWI is to "control, operate, maintain, manage and carry on a general trucking, moving and transportation business." Stip., ¶¶ 46, 53. From November 1990 to June 12, 1991, the companies shared a common business address, 393 D Street, South Boston, Massachusetts. Much OF CWI's business concentrated on commercial moving in the Boston area, with little household or long distance moving. WWI conducts both a commercial and household moving business. Its commercial moving operations, comprising approximately 60% of its business, operate from the South Boston facility. The household operations, which make up approximately 40% of its business, operate from the Dedham facility.

---

**6.** WWI also argues that it is not CWI's "successor." Plaintiffs never claim successor liability, except in the limited context of alter ego analysis; therefore, I need not address the successor argument.

In September 1989, CWI filed business certificates under the name of "Walsh Movers" and registered that name as a service mark with the Commonwealth's Secretary of State. Since November 1991, WWI has conducted business under the name of "Walsh Movers." WWI does not pay compensation to CWI for use of the service marks.

Management and Supervision.

Thomas R. Walsh, Sr. has been the chief executive officer of CWI from the fall of 1980 to the present. From the fall of 1980 through December 31, 1986, he was also CWI's president. On January 1, 1987, William Walsh became president of CWI and served through August 1, 1990. On August 2, 1990, he resigned and Thomas Walsh resumed the position as CWI's president. William Walsh continues to serve as president and chief executive officer of WWI.

William J. D'Agostino held the positions of vice president and senior accountant at CWI from 1980 through 1986. From June 13, 1991 to the present, Mr. D'Agostino was employed as WWI's senior accountant. He performed essentially the same job functions for both employers. From 1980 through June 12, 1991, David Ferracane served as vice president in charge of sales for CWI. On June 13, 1991, he assumed that same position for WWI. Similarly, Albert Hickey served as vice president in charge of operations for CWI from 1980 through June 12, 1991. On June 13, 1991, he became WWI's vice president in charge of residential operations. His functions at both CWI and WWI were the same, except that with WWI he directed only the non-union work force located at Dedham.

Equipment.

As of January 1991, CWI held twenty-one commercial vehicles, including eighteen trucks and three tractors, under a financing agreement with Mack Truck Leasing Corporation. In February 1991, CWI agreed to lease eighteen of the twenty-one vehicles to WWI for $1,000 per month. WWI has never paid the lease fee; instead it makes payments directly to Mack Truck Leasing pursuant to the financing agreement between Mack and CWI. Prior to February 1991, all twenty-one vehicles exhibited the name "C.

Walsh Movers," but since that time the "C." has been removed.

Anti–Union Animus.

Before CWI's closing, the Union filed an unfair labor practice charge with the National Labor Relations Board ("NLRB") against it and Metromove, Inc., alleging refusal to bargain with the Union. The NLRB investigated and dismissed the charge as lacking merit. After CWI closed on June 12, 1991, its employees and members of the Union picketed its South Boston location. Union members also picketed WWI's Dedham facility. Picket line violence provoked WWI to file two claims against the Union, an unfair labor practice charge with the NLRB, and a civil action for assault in Norfolk Superior Court against the Union. The Superior Court enjoined members of the Union from acts and threats of violence against WWI and its employees.

WWI employees then applied to the Cambridge District Court for issuance of a criminal complaint against a Union member, alleging assault at the picket line. Members of the Union responded with their own application for a criminal complaint against WWI for other acts of violence. To resolve the labor unrest, WWI voluntarily recognized the Union as collective bargaining representative for its employees. All civil, criminal and NLRB charges were then withdrawn or settled.

Ownership.

Although the parties agree that Thomas R. Walsh is the sole owner of CWI, and William Walsh is the sole owner of WWI, they diverge on the appropriate emphasis and interpretation to give those facts. Defendants argue that the separation of ownership demonstrates that WWI is not CWI's alter ego. Plaintiffs insist, however, that the split ownership is illusory. First, WWI pays no compensation directly to CWI pursuant to the lease agreement for the eighteen trucks. It also pays no rent to the owner of either of the properties where it conducts business. The South Boston property at 393 D Street is owned by Trafalgar Square Realty Trust, whose trustee is Thomas Walsh and whose beneficiaries are Thomas Walsh and his wife.

Although WWI is signatory to a lease agreement regarding the property, it has never paid rent. WWI's Dedham facility at 250 Elm Street is owned by Trafalgar West Realty Trust, whose trustee is also Thomas Walsh and whose equitable interest is also owned by Thomas Walsh and his wife. WWI leases the property from Trafalgar West, but pays no compensation.

### CONCLUSION

These facts convincingly demonstrate that WWI is CWI's alter ego. The companies' business purpose is identical. Although WWI engages in commercial *and* residential moving while CWI engaged only in commercial moving, the similarity in operations is substantial. *See C.E.K.*, 921 F.2d at 354–55 (companies were alter egos even where one performed general construction services and one performed only plumbing work). The entities shared names, managers and trucks apparently with little differentiation between the two operations. Although the companies are under separate ownership, the owners worked closely together, succeeding one another in executive and managerial roles. CWI provides equipment, resources and property to WWI without monetary consideration. The labor disputes which affected both CWI and WWI indicate sufficient anti-union animus to support a finding that WWI was CWI's alter ego and should be responsible for its outstanding liabilities to the Funds. Summary judgment on these counts is granted for plaintiffs.

Single–Employer Liability.

(1) Civil Action No. 91–13289–Z: Counts V, VI and X

(2) Civil Action No. 91–13284–Z: Count III

■ Plaintiffs argue that WWI, Metromove and CWI are single employers and thus jointly and severally liable for the debts incurred by one entity. Defendants challenge this argument as to WWI and CWI, but do not address it with respect to Metromove.

■ Contrary to plaintiffs' assertion of joint and several liability, a finding of single employer status does not mean that one business is bound by a union contract signed by another unless there is an additional finding that the employees of each constitute a single appropriate bargaining unit. *C.E.K.*, 921 F.2d at 354. To determine whether two or more business entities comprise a single employer, the court applies four factors: (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership. *Penntech*, 706 F.2d at 25. No one factor is controlling, but single employer status is marked by an absence of an "arm's length relationship found among unintegrated companies." *Id.* (citations omitted). The ultimate question is whether there is joint control of critical matters at the policy level. *Id.*

Interrelation of Operation.

Plaintiffs contend that WWI could not operate without the name and assets of CWI. They point out that WWI utilizes CWI's eighteen trucks and its service mark without paying compensation to CWI. They also note that Metromove, Inc., like WWI, had its facilities located at 250 Elm Street, Dedham, Massachusetts, and was owned by William Walsh, but had no assets, no employees, and conducted no business. Thus, according to plaintiffs, CWI, WWI and Metromove were a single employer.

Defendants maintain that because WWI never acquired any of CWI's assets nor assumed any of its liabilities, the two operations are not interrelated. Further, WWI did not hire any of CWI's employees until after CWI ceased operations and WWI entered into a collective bargaining agreement with the Union. CWI did not control WWI's sales, customer relations, billing or purchasing.

Defendants' arguments focus on segments of the companies' operations that did not intersect. They fail to explain the significance of the portions that *were* related. Moreover, defendants' claim that WWI never acquired CWI's assets is contradicted by the fact that WWI uses CWI's trucks, albeit while paying all or some portion of CWI's obligations to Mack Truck, and the fact that WWI operates from the same premises as

CWI without paying rent. Based on the foregoing, I conclude that there was substantial interrelation of operations.

Common Management.

As discussed in the alter ego analysis, above, CWI and WWI shared common management as evidenced by the employment by both companies of William Walsh, William D'Agostino, David Ferracane and Albert Hickey. Defendants' arguments that the companies did not share employees or supervisors is not relevant to the question of common management.

Centralized Control of Labor Relations.

The record is devoid of evidence that CWI, Metromove and WWI shared control of labor relations. Although CWI and WWI signed standard collective bargaining agreements with the Union, the same can be said for any unionized companies whose employees are represented by the Teamsters.

Common Ownership.

As discussed above, CWI and WWI do not share common ownership, but neither do they conduct business completely at arm's length. WWI and Metromove, Inc. were both owned solely by William Walsh.

These factors point in somewhat different directions. There is some interrelation of operations and substantial common management, but no evidence of centralized control of labor relations and only incomplete commonality of ownership. The fundamental inquiry is whether there "exists overall control of critical matters at the policy level," *Penntech*, 706 F.2d at 25. Because plaintiffs submit no persuasive evidence of such control, their motion for summary judgment is denied and defendants' motion is granted as to these counts.

### SUMMARY

In Civil Action No. 91–13289–Z, the Pension Fund's motion for summary judgment is allowed and defendants' motion is denied as to Counts I, II, III, IV, VII and IX. Defendants' motion is granted and the Pension Fund's motion is denied as to Counts V, VI and X. Because Count XI was dismissed, it was not considered here, but will be assessed if the Pension Fund's motion for leave to file a third-amended complaint is ultimately allowed.

In Civil Action No. 91–13284–Z, the Health Fund's motion is allowed and defendants' motion is denied with respect to Counts I and II. Defendants' motion is allowed and the Health Fund's motion is denied as to Count III.