MASSACHUSETTS CARPENTERS CEN-
TRAL COLLECTION AGENCY,
Plaintiff, Appellee,

v.

BELMONT CONCRETE CORPORATION
and Algar Construction Corporation,
Defendants, Appellants.

No. 97–2285.

United States Court of Appeals,
First Circuit.

Heard March 2, 1998.

Decided March 27, 1998.

inconsistent statement—we see no reason to dis-    turb the jury's verdict.

George A. Fairbanks, III, Taunton,, MA, with whom Fairbanks & Koczera, New Bedford, MA, John F. Creedon, and Creedon & Murphy, Brockton, MA, were on brief, for appellants.

Aaron D. Krakow, with whom Krakow & Souris, Boston, MA, was on brief, for appellee.

Before LYNCH, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

LYNCH, Circuit Judge.

Within a year of signing a collective bargaining agreement with the Massachusetts Carpenters Union, the Belmont Concrete Corporation went out of business. Under that agreement, Belmont was obligated to pay into Union employee benefit funds for the benefit of its workers.[1] Another concrete company, Algar Construction Corporation (owned and managed from the same location by members of the same families as Belmont) employed many of Belmont's employees, used some of Belmont's equipment, and worked on contracts for the same company with which Belmont had worked. When Belmont stopped making the payments it was obligated to make to the fund, the Massachusetts Carpenters Central Collection Agency (MCCCA) sued, alleging violations of Section 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1145. It sued Belmont on the agreement and Algar on the theory that Algar was an alter ego of Belmont, and so liable for its obligations to the benefit funds. The defendants protested that the person who signed the agreement for Belmont had no authority to do so, that there was never an enforceable agreement, and that Algar, which had never signed the agreement, could not be liable for Belmont's debts.

On summary judgment, the district court ruled for the plaintiff in a carefully reasoned opinion.[2] It ordered Belmont, now defunct and assetless, and Algar to pay MCCCA $121,339.97 in unpaid contributions and penalties. We affirm largely on the basis of the district court opinion, and further discuss the alter ego issue. We do so because this issue frequently arises in suits to hold one company liable for benefit plan contributions another company has contracted to make under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub.L. 96-364, 94 Stat. 1208 (1980), which amends ERISA, 29 U.S.C. §§ 1001-1461.[3] We also do so to

---

1. The funds are the Massachusetts · Carpenters Pension Fund, the Massachusetts Carpenters Guaranteed Annuity Fund, the Massachusetts Health Benefits Funds, the Massachusetts Carpenters Training Program, the Massachusetts Construction Industry Advancement Program, the Massachusetts Carpenters Apprenticeship and Training Fund, the Massachusetts Carpenters Promotional Fund, the National Apprenticeship and Training Fund, the National Health and Safety Fund, and the Foundation for Fair Contracting of Massachusetts.

2. *See Massachusetts Carpenters Cent. Collection Agency v. Belmont Concrete Corp. and Algar Constr. Corp.*, No. 95–10491 (D.Mass. Sept. 30, 1997).

3. The employee benefit funds at issue here include pension funds. Multiemployer pension plans are "defined-contribution in, defined-benefit out," *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7th Cir.1989) (en.banc), which means that the plan must pay promised levels of benefits to participants even if expected contributions are not made. *See id.* This means that if some employers fail to make agreed-upon contributions, "the remaining employers must assume the burden for funding benefit liabilities left by the withdrawing employer. In addition, a withdrawal may reduce the plan's contribution base and necessitate an increase in the rate of contributions to the plan." H.R.Rep. No. 96–869, Part II, at 15, *reprinted in* 1980 U.S.C.C.A.N. 2918, 3004. The MPPAA governs the manner in which employers contribute to and withdraw from multiemployer plans, and is designed "to protect a multiemployer plan from the adverse financial impact of employer withdrawal." *Id.* Alter ego and successor liability, by holding companies to their obligations, serve that important interest.

emphasize that the alter ego jurisprudence developed in cases brought under the National Labor Relations Act, 29 U.S.C. §§ 141–197, is applicable in cases brought under ERISA where the basis for imposition of liability is also the alter ego doctrine.

## I

As summary judgment has been granted, we review the facts in the light most favorable to the defendants and will draw all reasonable inferences in their favor. *See Champagne v. Servistar Corp.*, 138 F.3d 7, 8–9 (1st Cir.1998). The district court's opinion thoroughly recounts the facts of the case, and we focus on the facts relevant to the alter ego issue.

### A. *The Companies*

Belmont and Algar both perform concrete work in the construction industry in Massachusetts. Algar was formed in 1990 and remains active today. Belmont was formed in 1992 and was active until the end of 1993. Each company had its principal place of business at 37 Belmont Street in Brockton, Massachusetts. Belmont occupied offices on the fourth floor; Algar occupied offices in the basement.

Belmont and Algar are family businesses owned and operated by members of the Bota, Diaz, and Guerreiro families. Belmont was formally owned by Lionel Diaz ("Diaz") and Anita Bota (Diaz' wife's cousin). Although an "owner," Anita Bota only performed occasional secretarial work for Belmont; Belmont was actually controlled by Diaz, Victor Guerreiro ("Guerreiro"), and Horacio Bota ("Bota"), Anita Bota's father. These men negotiated the contracts, supervised the construction sites, and generally managed the business. Algar was formally owned by Margaret Bota (Bota's daughter) and Sarita Diaz (Diaz' wife, Guerreiro's daughter and Bota's niece). Like Anita Bota, the two "owners" performed primarily secretarial work, and Algar was actually controlled by Bota, Guerreiro and Diaz.

Although Bota, Diaz, and Guerreiro took the position that they did no work for Algar until all Belmont work had been completed, specific facts from their own depositions establish some overlap in responsibilities. Guerreiro stated in his deposition that he was involved in the preparation of bids and negotiation of contracts for Algar in 1993. Bota stated that he signed a contract for construction work on behalf of Algar in 1993. And Diaz acknowledged that his stamp was used to sign a contract with Middlesex Construction Corporation on behalf of Algar in 1993.

Belmont and Algar were intertwined in other ways. They shared employees. Maurice Law and Paul Merhey acted as supervisors and estimators for Belmont, and then for Algar after Belmont ceased conducting business. Other Algar employees who previously worked for Belmont included Mario Rosa, Antonio Gomes, Joao DaSilva, George Raposa, Jeff Bassett, Paulo Costa, Manual Pina, and Joao Viveiros. Belmont and Algar also shared business. Belmont was a subcontractor for Middlesex Construction for two of the five construction projects it performed after April 1, 1993 (until it ceased conducting business near the end of 1993); Algar was a subcontractor for Middlesex Construction for eight of the twelve projects it performed after April 1, 1993. Belmont also made use of Algar's trucks and equipment through an informal "leasing" arrangement for which there is no documentation.

Finally, there is also evidence that employees were working on both Algar and Belmont projects at the same time. On May 1, 1993, a Union representative saw Algar employees leave a job at a West Springfield site and travel to a worksite where there was a truck belonging to Belmont. The construction supervisor at the second site informed the Union representative that he worked for Belmont and that Belmont was the contractor at that location.

### B. *The Agreement*

On April 23, 1993, Bota, on Belmont's behalf, signed the State–Wide Agreement ("Agreement") with the Carpenters Union. The Agreement binds each signatory contractor to the terms and conditions of the collective bargaining agreements of the various Massachusetts Carpenters Local Un-

ions,[4] which in turn require that the contractor make employee contributions to the MCCCA for each hour of carpentry work performed by its employees.[5] In addition, the collective bargaining agreements incorporate by reference the trust agreements of the Carpenters Union affiliated employee benefit funds.

After signing, Belmont complied in part with its obligations under the Agreement to make employee benefit contributions to the MCCCA. Belmont's carpenters performed 3,925 hours of work between April 1993 and November 1993. Belmont made contributions to the MCCCA for 2,144 hours of that work.

Algar never signed the Agreement. Between April 23, 1993, and September 1996, Algar's carpenters performed approximately 8,070 hours of carpentry work. Algar made no contributions to MCCCA for this work.

On March 9, 1995, MCCCA filed this action against Belmont and Algar, alleging violations of Section 515 of ERISA, 29 U.S.C. § 1145.[6] MCCCA sought $3,271.37 in unpaid contributions from Belmont and $69,351.97 in unpaid contributions from Algar. MCCCA argued that Belmont was a signatory to the Agreement and bound by its terms, and that nonsignatory Algar was also bound by the Agreement by virtue of being Belmont's alter ego. Defendants responded that Bota did not have authority to sign the Agreement on Belmont's behalf, and that, regardless, Algar was not Belmont's alter ego. The district court granted summary judgment in MCCCA's favor, granting MCCCA the full amount of damages sought plus penalties as

defined in the governing collective bargaining agreement—a total of $121,339.97. Defendants appeal.

## II

■ The alter ego doctrine is meant to prevent employers from evading their obligations under labor laws and collective bargaining agreements through the device of making "'a mere technical change in the structure or identity of the employing entity ... without any substantial change in its ownership or management.'" *NLRB v. Hospital San Rafael, Inc.*, 42 F.3d 45, 51 (1st Cir.1994) (quoting *Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 259–61 n. 5, 94 S.Ct. 2236, 2242, 41 L.Ed.2d 46 (1974)). Although the alter ego doctrine is primarily applied in situations involving successor companies, "where the successor is merely a disguised continuance of the old employer," *C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB*, 921 F.2d 350, 354 (1st Cir.1990) (citing *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106, 62 S.Ct. 452, 455–56, 86 L.Ed. 718 (1992)), it also applies to situations where the companies are parallel companies. *See Union Builders, Inc. v. NLRB*, 68 F.3d 520, 524 (1st Cir.1995). In this case, Algar was both parallel to Belmont and successive to Belmont. A finding that two employers are alter egos will bind the nonsignatory to a collective bargaining agreement between the union and the nonsignatory's alter ego. *See Hospital San Rafael*, 42 F.3d at 52–53; *Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 24 (1st Cir.1983).

---

**4.** The Agreement bound the signatory contractor to observe the conditions of the collective bargaining agreement "in the geographical jurisdiction where the work is being performed."

**5.** The collective bargaining agreement for the Boston and Eastern Massachusetts region, in which Belmont was located, set the contributions at the rate of $7.97 per hour from June 1, 1993, through August 1, 1993; $8.34 per hour from August 1, 1993, through August 1, 1994; and $8.69 per hour from August 1, 1994, through August 1, 1995. Under that agreement, failure to contribute to the funds constitutes a violation of the agreement and, if legal action is necessary to force payment, the employer is liable for the delinquent amounts plus interest at the annual

rate of 2% over the prime rate from the date when payment was due to the date when payment is made, plus 20% liquidated damages, reasonable attorneys' fees, and any other costs of litigation.

**6.** Section 515 of ERISA provides:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

Although developed in the labor law context, alter ego or successor liability analysis has been applied to claims involving employee benefit funds brought under ERISA and the LMRA. *See Langone v. C. Walsh, Inc.,* 864 F.Supp. 233 (D.Mass.1994), *aff'd,* 1996 WL 672277 (1st Cir.1996); *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323 (7th Cir.1990); *Central States, Southeast and Southwest Areas Pension Fund v. Sloan,* 902 F.2d 593 (7th Cir.1990); *United Steelworkers v. Connors Steel Co.,* 847 F.2d 707 (11th Cir.1988); *Hawaii Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.,* 823 F.2d 289 (9th Cir. 1987). The rationale is that "an employer who evades his pension responsibilities gains an unearned advantage in his labor activities. Moreover, underlying congressional policy behind ERISA clearly favors the disregard of the corporate entity in cases where employees are denied their pension benefits." *Chicago Dist. Council of Carpenters Pension Fund v. P.M.Q.T., Inc.,* 169 F.R.D. 336, 342 (N.D.Ill.1996) (citations and internal quotation marks omitted).

▆▆▆ In determining whether a nonsignatory employer is an alter ego of a signatory, we consider a variety of factors, including continuity of ownership, similarity of the two companies in relation to management, business purpose, operation, equipment, customers, supervision, and anti-union animus—i.e., "whether the alleged alter ego entity was created and maintained in order to avoid labor obligations." *Hospital San Rafael,* 42 F.3d at 50; *see C.E.K.,* 921 F.2d at 354. No single factor is controlling, and all need not be present to support a finding of alter ego status. *See Hospital San Rafael,* 42 F.3d at 51. In particular, there is no rule that wrongful motive is an essential element of a finding of alter ego status. *See id.*

The defendants here argue that the rule of *Hospital San Rafael* is incorrect, and that wrongful motive *is* a sine qua non for finding alter ego status in an ERISA case. On this point, they say, there are material facts in dispute. Defendants rely on *United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080 (1st Cir.1992), for this legal proposition. Although *163 Pleasant St.* bears some similarity to the present case (the cause of action was based on ERISA and the LMRA and the plaintiffs sought backpayments to a health care fund), we think it is inapposite here. Fundamentally, *163 Pleasant St.* is a case about personal jurisdiction: whether there was personal jurisdiction in Massachusetts over a foreign parent corporation based on the activities of a Massachusetts subsidiary. The court held that personal jurisdiction cannot be exercised over a foreign company through a corporate veil-piercing theory absent a showing of fraud. This holding is not based on ERISA and the LMRA. In addition, we think the policies generally served by various corporate veil-piercing approaches, *see Birbara v. Locke,* 99 F.3d 1233 (1st Cir.1996), address different interests than does the alter ego doctrine.[7] We disapprove of the direct application of those veil-piercing rules for jurisdictional purposes to the very different problem we face here.[8]

Rather, we think that the *Hospital San Rafael* case provides the better and more apt model. It is consonant with the alter ego jurisprudence developed in the labor law context and more fully serves the policies that underlie the MPPAA and ERISA. It is true that *Hospital San Rafael* and the present case arise in different contexts: *Hospital San Rafael* involved the NLRB's application for enforcement of its order to a successor hospital to bargain with a union that had been recognized at a predecessor hospital,

---

**7.** As the Seventh Circuit has noted about the area of successor liability, "the Supreme Court [in *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 182 n. 5, 94 S.Ct. 414, 424 n. 5, 38 L.Ed.2d 388 (1973),] [has] imposed liability upon successors beyond the bounds of the common law rule in a number of different employment-related contexts in order to vindicate important federal statutory policies." *Upholsterers' Int'l Union Pension Fund,* 920 F.2d at 1326.

**8.** We leave to another day the issue of what role anti-union animus would play in an ERISA suit for contributions to an employee benefit fund where liability is sought to be imposed on a parent company for the actions of its subsidiary on a veil-piercing theory.

based on the NLRB's determination that the successor and predecessor hospitals were alter egos. This case involves a direct action against the employer by the collection agency for a union-sponsored employee benefit fund. We think this is a distinction without a difference, at least for present purposes, as the fundamental alter ego analysis animating both situations is the same.

## III

■ Applying the alter ego test, we conclude that Algar is Belmont's alter ego, and therefore liable under the Agreement. First, there is continuity of ownership. *See Hospital San Rafael*, 42 F.3d at 51. Continuity of ownership has been found to exist when the nonsignatory and signatory companies are owned by members of the same family. *See Sloan*, 902 F.2d at 597; *J.M. Tanaka Constr., Inc. v. NLRB*, 675 F.2d 1029, 1034–35 (9th Cir.1982). This would be especially telling when the named owners of the nonsignatory have little responsibility or control over the management of the company, and do not have a financial investment in the company. Here, both Belmont and Algar were formally owned by members of the Diaz, Bota, and Guerreiro families, and the companies were in fact owned, operated and managed by the same three men. Significantly, the three women who "owned" Belmont and Algar were owners in name only: they had no financial investment in the company, and performed primarily secretarial work within the office.[9] The evidence suggests that Sarita Diaz and Margaret Bota were named as owners of Algar so that Algar might obtain certification as a Women Business Enterprise: after certification was denied, Sarita Diaz and Margaret Bota transferred ownership to Guerreiro and Bota without receiving financial consideration in return.

As to the other prongs of the alter ego test, it is undisputed that Belmont was and Algar is in the construction business performing concrete work in Massachusetts. It is undisputed that their offices are in the same building, although on different floors. It is undisputed that the companies are managed and supervised by the same three people: Diaz, Bota, and Guerreiro. It is also clear that the two companies shared a large number of employees, that a substantial portion of each company's work was for the same client, and that the companies shared equipment through informal leasing arrangements.

The district court did not reach a decision on whether there was anti-union animus, other than to say that the evidence was suggestive of its existence. A finding of anti-union animus is not essential to sustain a finding that Belmont and Algar are alter egos. *See Hospital San Rafael*, 42 F.3d at 51. The other evidence is sufficient to support the conclusion that a reasonable finder of fact would have to conclude that Algar is Belmont's alter ego.

Regarding damages, we have carefully reviewed the district court's determination of damages and are satisfied that it was correct. As the district court aptly points out, there is no credible evidence to support the defendants' argument that certain work was "grandfathered" into the Agreement and therefore not subject to its requirements; such an understanding is certainly not present in the language of the Agreement.

The decision of the district court is *affirmed*. Costs are awarded to MCCCA.

---

9. We agree with the district court that, on the evidence presented, it is difficult to find that Margaret Bota played an active role in the company when, as the district court observed, "all of the other evidence provided, included the information supplied by Bota, Diaz, and Guerreiro themselves in their depositions, points in the other direction."