John T. JOYCE, et.al., Plaintiffs,

v.

**SILVERI TILE COMPANY, L.C., Defendant.**

No. CA 97–1635.

United States District Court, District of Columbia.

Nov. 25, 1998.

Ira R. Mitzner, Bridget O'Connor, Dickstein Shapiro Morin & Oshinsky LLP, Washington, DC, for Plaintiffs.

Arthur H. Blitz, Paley Rothman Goldstein Rosenberg & Cooper, Chtd., Bethesda, MD, for Defendant.

## MEMORANDUM

JUNE L. GREEN, District Judge.

Before the Court are Plaintiff Trustees of the Bricklayers and Trowel Trades International Pension Fund's ("Fund") Motion for Summary Judgment, Defendant Silveri Tile Company, L.C.'s ("Silveri") Opposition thereto, and the Fund's Reply. For the

### I. Background

This action involves a dispute over the collection of contributions to the Fund, a multi-employer benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). Defendant is a small, closely held business, that installs ceramic tiles. The Fund seeks payment of $398,-403.83, the total amount of delinquent contributions allegedly due from Silveri, pursuant to a collective bargaining agreement ("CBA"), for covered work performed from January 1992 through April 1998. The facts giving rise to this suit are set forth in detail below.

Silveri allegedly signed collective bargaining agreements ("Agreements") beginning in June 1985, and again in February 1997, with the Tile, Marble, Terrazzo Finishers and

Shopmen International Union, Local Union No. 40 ("Local 40 Agreements") and in June 1988 with the International Union of Bricklayers and Allied Craftsmen, Local Union No. 32 ("Local 3 Agreement"). (*See* Plaintiffs' Memorandum of Points and Authorities In Support of Motion For Summary Judgment ("Supp.Mem.")). Pursuant to these Agreements, Silveri was obligated to file reports and make contributions to the Fund for covered employees. (Supp.Mem. at 1). Governed by ERISA, this Fund provides pension and other benefits to employees who work in the construction industry under contracts entered into between Bricklayer local unions and employers. *Id.* at 2. Included in these agreements are "rollover clauses" that provide for continuation of the Agreements until a written termination letter is received. *Id.* at 3.

Plaintiffs state that in late 1996, John Mason, a Business Manager for Local 32, became aware that Defendant was performing covered work in the Local 32 jurisdiction. *Id.* Mason so advised the Fund in early 1997, and as a result, Silveri's books and records were audited. *Id.* Finding no written notice of termination from Silveri, delinquent contributions were calculated for the months of January 1992 through April 1998 totaling $209,722.60. *Id.* at 4.

Defendant Silveri concedes that no union dues have been paid during the time in question, but argues that the Agreements entered into with the unions were Section 8(f) prehire agreements, that Defendant clearly and repeatedly repudiated by conduct several years earlier.[1] (Memorandum of Points and Authorities In Support of Opposition To Plaintiffs' Motion for Summary Judgment ("Opp.Mem.")). In addition, Defendant claims that the Agreement sued upon by the Fund terminated upon the dissolution of the local union in 1988, thereby extinguishing the rights of the Fund. *Id.* at 2. Finally, Defendant contends that a former company, Silveri Tile is now defunct and there can be no liability for delinquent contributions for Defendant Silveri Tile, L.C. because it is not an alter ego. Even if liability can be found, it

argues the Fund has incorrectly calculated the delinquent contributions. *Id.*

## II. Discussion

## III. Summary Judgment

A motion for summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgement as a matter of law." Fed. R.Civ.P. 56(c); see also *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the material presented in the light most favorable to the nonmoving party, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and resolve all doubts as to facts or the existence of facts against the moving party. *United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

### 1. Contract Enforcement

The first issue is whether the Fund may enforce the contract between Local 40 and Silveri as written, regardless of any defenses Silveri may have against the union.

Silveri contends that the relevant Local 40 CBA terminated upon dissolution of that union in 1988, and that all obligations to Local 40 had been settled through 1992. Further, Defendant contends that in order to continue with this current suit, the Fund must demonstrate that the agreement can be enforced by another union, in this case, Local 44, then Local 32. Citing *Sun Oil Co. of Pennsylvania,* 228 NLRB 1063 (1977), Defendant notes that in order to do this, there must have been proper affiliation or merger, neither of which, Defendant contends, occurred here.

 Federal labor policy, and relevant case law interpreting it, illustrate that a "pension or welfare fund is like a holder in due course in commercial law or like the receiver of a failed bank—entitled to enforce the writing without regard to the understandings or defenses applicable to the origi-

---

1. 29 U.S.C. § 158(f).

nal parties." *Central States, Southeast And Southwest Areas Pension Fund v. Gerber Truck Service, Inc.,* 870 F.2d 1148, 1149 (7th Cir.1989). The Second Circuit has applied this reasoning in cases involving ERISA collection actions by ERISA funds, holding that no defenses going to the formation of the underlying CBA are available, and specifically, that an employer may not raise the defense of a union's abandonment of a collective bargaining agreement or that the union lacked majority status. *Benson v. Brower's Moving & Storage, Inc.,* 907 F.2d 310 (2nd Cir.1990). The interest being protected in *Benson* was the benefit plan's ability to rely on the contribution promises of employers. *Id.* Thus, in a situation such as this, once an employer knowingly signs an agreement that requires him to contribute to an employee benefit plan, he may not escape his obligation by raising defenses that call into question the union's ability to enforce the contract as a whole. *Id.* at 314.

*Benson* is on point with regard to Silveri's contract defense. The termination of Local 40 in 1988, and the question of which union can now claim to be the successor of Local 40 is of no importance. Insofar as Congress "intended to insulate benefit plans from exactly these defenses in adding Section 515[2] to ERISA", the fact that the union is no longer in existence does not relieve Silveri from its obligation to pay into the Fund. *Id.* at 313.

Moreover, in a Fifth Circuit case, *Louisiana Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller General Masonry Contracting Company,* 157 F.3d 404, 1998 WL 677174 (5th Cir. La.), the Court of Appeals spoke directly to the issue of successor unions in ERISA actions. In *Miller,* the court held that the defense of lack of proper successorship was not avail-

able in a Section 515 action, as it was merely raising questions as to the enforceability of the underlying CBA. *Id.* The court reasoned that because status as a successor union involves complex labor law determinations that are better left to the National Labor Relations Board ("NLRB"), an employer must continue paying into the funds until questions concerning validity of the CBA are resolved by arbitration or the NLRB. *Id.*

■ Like *Miller,* Silveri may not raise the defense of proper successorship of Local 40 to Local 44, then Local 35.[3] In addition, because the only fraud claimed by Silveri deals with the signature on the Local 32 agreement and not the underlying CBA with Local 40, Silveri has no valid defense to the enforceability of the underlying CBA.[4] (Opp.Mem. at 21).

Here, Silveri's contract defenses fail as a matter of law. Neither the contention that the CBA with Local 40 was terminated upon dissolution of the union, nor the idea that proper successorship could not be claimed by another union will release Silveri from the obligation to pay the past due contributions owed to the plaintiff.

### 2. Repudiation of Section 8(f) Prehire Agreement

■ The Court is now faced with the question of whether the unilateral repudiation of Section 8(f) prehire agreements is available as a defense in an ERISA action to collect past due contributions.

■ Section 8(f) of the National Labor Relations Act, 29 U.S.C § 158(f), was adopted to create an exception in the construction industry to the general policy prohibiting binding CBA's between employers and employee bargaining units that have not

---

**2.** Section 515 reads:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not ·inconsistent with the law, make such contributions in accordance with the terms and conditions of such plan or such agreement.
29 U.S.C. § 1145.

**3.** Deposition of John Mason (hereafter, "Mason Dep.") discusses how the members of Local 40 merged with Local 44, then with Local 35.

**4.** In *Miller,* the court pointed out that the only defenses available in an action such as this are when the pension contributions are illegal, when the CBA is void *ab initio* (fraud in the execution) or the employees vote to decertify the union. *Miller,* 1998 WL 677174, at 4, 157 F.3d 404, 408–09.

received majority support. Thus, without first having established majority status, a union may enter into an agreement with an employer fixing the terms and conditions of employment for the workers hired by that signatory employer. *See Jim McNeff, Inc. v. Todd,* 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983).

Silveri argues that it properly repudiated the Prehire Agreement prior to the union's attainment of majority support of the employer's employees, and, therefore, Silveri was no longer required to file reports and make contributions to the Fund. *Citing McNeff* at 260, 103 S.Ct. 1753. The Plaintiff, for its part, argues that Defendant may not unilaterally repudiate the 8(f) Prehire Agreement by either conduct, or otherwise.

At the center of this dispute is the proper interpretation of Section 8(f). Prior to 1987, the NLRB interpreted 8(f) to permit unilateral repudiation. *See International Association of Bridge, Structural and Ornamental Iron v. NLRB,* 843 F.2d 770, 774 (3rd Cir. 1988). This Circuit, as well as the Supreme Court, even recognized such an interpretation as reasonable and allowed decisions based on it to stand. *See McNeff* and *Overhead Door,* 681 F.2d 1 (C.A.D.C. 1982). In 1987, however, the NLRB re-examined its interpretation of Section 8(f) and decided, in fact, that unilateral repudiation of prehire agreements was not permissible. *Deklewa v. International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 3, AFL–CIO,* 282 N.L.R.B. 1375 (1987). The NLRB gave several reasons for its decision, including the idea that the development of the current law under *R.J. Smith Construction Co.,* 191 N.L.R.B. 693 (1971) and *N.L.R.B. v. Local Union No. 103 Intern. Ass'n of Bridge, Structural and Ornamental Iron Workers,* AFL–CIO *(Higdon Contracting Co.),* 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978) [Higdon] had exposed significant deficiencies. *Id.* More specifically, the NLRB pointed out that the policy of labor relations in the Act generally favors the adherence to voluntary CBA's. *Id.* at 15. To

remedy this, the Board offered a revised interpretation of Section 8(f), ruling that it would no longer be subject to unilateral repudiation. *Id.* In this decision, the Board was careful to point out that the new policy it was adopting was consistent with the principles that the Supreme Court identified in *Higdon* and *McNeff* as central to Section 8(f) agreements.[5] *Deklewa,* 282 NLRB at 1375. With their holding in *Deklewa,* the Board intended to better achieve Congress' objectives.

In the time since the *Deklewa* decision, all but two circuits that have confronted the issue have adopted the NLRB's new interpretation and disallowed unilateral repudiation of Section 8(f) prehire agreements. The D.C. Circuit has not dealt with the issue. As a result this Court is confronted with the question of whether it can adopt the *Deklewa* decision given the rulings of the Supreme Court as well as our own Circuit. For the reasons that follow, the Court concludes that it may do so.

In applying this new interpretation, the Court looks to the Seventh Circuit which speaks directly to the issue of *stare decis.* In *NLRB v. Bufco Corp.,* 899 F.2d 608 (7th Cir.1990), the court explained why previous decisions, including the Supreme Court decisions in *Higdon* and *McNeff,* do not preclude a new reading of this rule. The court determined that the Supreme Court did not substitute its own judgment or prescribe its own interpretation of Section 8(f), but concluded that the "Board's construction of the Act, although not the only tenable one, is an acceptable reading of the statutory language and a reasonable implementation of the purposes of the relevant statutory sections." *Id.* at 610. In addition, the court in *Bufco* points out that in *McNeff,* the Supreme Court relied on *Higdon* to such an extent that it really did no more than hold the Board's reading of the Act reasonable. *Id.* at 611.

This Circuit did the same in *Overhead Door,* when a pension, welfare and trust fund representing a carpenter's union sued an employer to recover unpaid contributions alleg-

---

5. Both cases identify Congress' objective in enacting Section 8(f) as an attempt to strike an appropriate balance between an employees right

of free choice, and stability in the construction industry.

edly due under a prehire agreement. In that case the court looked to the Supreme Court's ruling in *Higdon*, and reasoned that because that decision rested substantially on deference to the NLRB's interpretation of prehire agreements, the Board in this case was entitled to due consideration. From this, the court held that the Board had acted reasonably. Since the Board's revised interpretation of prehire agreements, this Circuit has not had the opportunity to revisit this issue further. It has, however, acknowledged *Deklewa* in four separate cases, each one examining the effect of *Deklewa* on the set of facts at issue.[6]

In light of the above reasoning that the Supreme Court merely reviewed the Board's interpretation of Section 8(f), and did not substitute its own judgment or interpretation, Silveri's defense that this Court is bound by *stare decis* fails.

### 3. Alter–Ego

█ Lastly, Silveri argues that there is a genuine issue of material fact as to whether Silveri Tile, L.C., (the defendant in this action) is the actual alter ego of Silveri Tile, (the company that signed the CBA's in question), and that summary judgment, therefore, should be denied.

█ The "alter ego doctrine" prevents employers from evading their obligations under labor laws and CBA's if the apparent transfer of operations is merely a sham, creating a disguised continuance of a predecessor's operations. *Fugazy Continental Corp., v. N.L.R.B.*, 725 F.2d 1416 (D.C.Cir.1984). Whether an alter ego exists is a legal question for the court. ERISA 1974, § 4221(a)(1), as amended, 29 U.S.C.A. § 1401(a)(1); *See also Paul S. Doherty, Jr. v. Teamsters Pension Trust Fund of Philadelphia and Vicinity*, 16 F.3d 1386 (3rd Cir. 1994) (holding that the issue of alter egos is properly resolved by the courts).

The Plaintiffs, arguing for application of the doctrine, offer Defendant's own admissions and other undisputed evidence to show that the two companies are essentially the same. In a recent ruling, the First Circuit applied the alter ego doctrine to an ERISA action under facts nearly identical to those here. *See Massachusetts Carpenters Central Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 308 (1st Cir.1998). The test used in *Belmont* included a variety of different factors to determine if there was a "mere technical change in the structure or identity of the employing entity … without any substantial change in its ownership or management." *Id.* at 308.[7] There, continuity of ownership was found based on a finding that both companies were owned by members of the same family. In addition, the court pointed out that when the named owners of the nonsignatory company have little responsibility or control over the management of the company, and do not have a financial investment in the company, continuity of ownership is particularly telling. *Id.*

Like *Belmont*, where the three owners of the nonsignatory company were owners in name only (*i.e.*—they had no financial interest in the company) and performed only secretarial work, Jean and Mary Lynn Silveri, who allegedly ran Silveri Tile Company, L.P., contributed very little. Robert Silveri testified that "[Jean's] probably really not that active. She has a back problem." (Silveri Dep. at 22). When asked about the duties of his sister-in-law, I testified, "She'll answer the phone, take some messages, do things like that." *Id.* Robert Silveri remained involved in the management of Silveri by preparing quotes for potential jobs and having the authority to accept or reject jobs on behalf of the company. (Silveri Dep. at 27–28). In addition, the two companies appear to have the same business purpose insofar as Robert Silveri admits that both are engaged in tile work. (Silveri Dep. at 20). Moreover,

---

6. These cases include: *Sheet Metal Workers' International Association AFL–CIO v. NLRB*, 989 F.2d 515 (D.C.Cir.1993); *Wilson and Sons Heating and Plumbing, Inc. v. NLRB*, 971 F.2d 758 (D.C.Cir.1992); *Bufco Corp. v. NLRB*, 147 F.3d 964 (D.C.Cir.1998); *Bentson Contracting Co. v. NLRB*, 941 F.2d 1262 (D.C.Cir.1991).

7. The factors considered included continuity of ownership; similarity of the two companies in relation to management, business purpose, operation, equipment, customers, supervision, and anti-animus.

 

Joni Holgroms, a payroll auditor who reviewed the books and records of both companies, declared that Silveri Tile, L.C. retained the same employees of Silveri Tile.[8] (Declaration of Joni Holmgren in Support of Plaintiffs' Motion for Summary Judgment ("Holmgren Dec.")). Finally, although Silveri Tile Company, L.C. did not retain the same accounts with local wholesalers as did Silveri Tile, Robert Silveri himself points out that in a business such as this, "[t]here isn't like you need a whole lot of stuff. Skill is all you need." (Silveri Dep. at 23).

Defendant's most forceful argument, that Silveri was started only for tax purposes, and, therefore, there was no unlawful intent, is unconvincing. *Belmont* expressly states that "there is no rule that wrongful motive is an essential element of a finding of alter ego status." *Id.* at 308. Accordingly, the Court holds that because the undisputed evidence shows the two companies to be indistinguishable, Silveri Tile and Silveri Tile Company, L.C. are alter egos.

### 4. Calculation of damages.

The automatic renewal clauses between the parties to a Section 8(f) Agreement bind the parties to contribute at the rate that was in effect at the time work was performed. Because Silveri never provided written termination to the union, its obligations have carried over into the new agreements with Local 44, and now Local 32. Silveri's contention that the damages be calculated only with the rate available in the CBA with Local 40 fails. Plaintiffs' damage calculations, which assume the ability to recover delinquent contributions going back to 1992, (*see* Holmgren Dec. at 4), must be recalculated in light of the Court's rulings above and the pendency of this Motion. Thus the Court shall keep open the question of additional damages until a supplemental request is made.

### IV. Conclusion

For the reasons set forth above, the Court concludes that Plaintiffs' Motion for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure should be granted. An appropriate Order accompanies this Memorandum.

---

**8.** Although the actual number of employees that went to work for the successor company is disputed, that at least some of the same employees remained the same is not.