**TRUSTEES OF THE B.A.C. LOCAL 32 INSURANCE FUND; Tile, Terrazzo and Marble Industry Pension Fund; Tile, Marble & Terrazzo Industry Join Industry Training Fund; Great Lakes Ceramic Tile Council Fund; Tile, Terrazzo and Marble Industry Supplemental, Unemployment Benefit Fund; and the Tile, Terrazzo and Marble Industry Vacation and Holiday Fund, Plaintiffs,**

v.

**Robert SILVERI d/b/a Silveri Tile Company, and Silveri Tile Company, L.C., Defendants.**

**No. 97–CV–72656–DT.**

United States District Court, E.D. Michigan, Southern Division.

Jan. 13, 2000.

William Z. Kolobaric, Southfield, MI, for plaintiff.

Albert B. Addis, Royal Oak, MI, John S. Regan, Detroit, MI, Francis J. Newton, Detroit, MI, for defendant.

## OPINION AND ORDER REGARDING PLAINTIFFS' AND DEFENDANTS' CROSS–MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This ERISA fringe benefits contribution action is presently before the Court on the parties' cross-motions for summary judgment which were filed while this case was pending before the Honorable Robert De-Mascio. Each of the parties has responded and replied to the opposing party's motion. The Court heard oral argument on these motions on October 21, 1999, and at the close of the hearing, ordered the filing of supplemental briefs. The parties have complied with the Court's directive. Having reviewed and considered Plaintiffs' and Defendants' briefs and supporting documents and the oral arguments of counsel, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

### II. FACTUAL BACKGROUND

Robert Silveri, doing business as "Silveri Tile Company," was engaged in the business of tile installation from 1980 through March 1994. In 1985, Silveri, as an independent contractor, became a signatory to a collective bargaining agreement entered into by the Detroit Ceramic Tile Contractors Association and Local Union No. 40 of the Tile, Marble, Terrazzo Finishers and

Shopmen International Union, AFL—CIO ("Local 40"). *See* Defendants' Ex. B; Plaintiffs' Ex. 3. Two years later, in 1987, Silveri signed on to the new Tile Contractors—Local 40 Agreement. *See* Defendants' Ex. B; Plaintiffs' Ex. 4. Both Local 40 contracts executed by Silveri contained "Evergreen" clauses, which automatically extended the contracts from year to year after their stated expiration dates, unless written notice to terminate or modify the Agreement was submitted by any of the parties at least 90 days prior to the expiration date. In accordance with the Local 40 Agreements, Silveri made contributions to Local 40's Fringe Benefit Funds through December 31, 1987 *See* Plaintiffs' Ex. 6.

In early 1988, the International Union with which Local 40 was affiliated dissolved. The members of Local 40 then elected to transfer their membership to Bricklayers and Allied Craftsmen International Union ("B.A.C.") Local 44. *See* Deposition of John Mason, Defendants' Ex. D, pp. 25; Affidavit of Carl Volpe, former Business Manager of Local 40 and Local 44, Plaintiffs' Response Ex. 4.[1] Local 44 took over responsibility for administering Local 40's contracts. *Id.* Following Local 44's assumption of Local 40's contracts, Defendant Silveri made the required fringe benefit contributions to Local 44's Fringe Benefit Funds. *See* Plaintiffs' Ex. 7.

The Plaintiffs also allege that, in addition to signing onto the Local 40 CBAs, on June 26, 1988, Silveri also entered into a collective bargaining agreement with B.A.C. Local 32 ("Local 32"). *See* Defendants' Ex. F.[2] (John Mason, Local 32's Business Manager, testified that the only difference between B.A.C. Local 32 and B.A.C. Local 44 was that Local 32 covered tile layers and Local 44 covered tile finishers. *See* Mason Dep. p. 24.[3])

In 1990, the Bricklayers merged Local 32 and Local 44 and created a successor Local 32 ("new Local 32") covering both tile layers and tile finishers. New Local 32 assumed responsibility for the administration of the pension and benefit funds of both old Local 32 and former Locals 40/44. It is the pension and benefit funds of the reconstituted Local 32 formed by the merger of old Local 32 and Local 44 that are the Plaintiff Funds in this action.

Despite denying ever having entered into any agreement with Local 32 (either the pre-1990 Local 32 or the new Local 32 formed after the merger with Local 44 [*see* note 2, *supra* ]), Silveri made contributions to new Local 32's Fringe Benefit Funds until January 1992. *See* Plaintiffs' Ex. No. 5. *See also*, Plaintiffs' Second Supplemental Brief, Ex. 3. All of the fund contributions paid by Silveri throughout this period were paid at the rate provided in the CBA in effect at the time payment was made. *See* Plaintiffs' Ex. 5 and Plaintiffs' Second Supplemental Brief Ex. 3.

After January 1992, however, Silveri ceased making any contributions to the Plaintiff Funds. Consequently, in November 1992, the Funds instituted a lawsuit against the company. *See B.A.C. Local*

---

1. Local 44 continued to operate out of the same office that Local 40 did and retained as officers the officers of Local 40. *See* Paragraphs 8–13, Affidavit of Carl Volpe former Business Manager of Local 40 and Local 44, Plaintiffs' Response Ex. 4.

2. Silveri denies that the signature on the signature page of the Local 32 Agreement is his. Plaintiffs have had Silveri's signature on the Local 32 Agreement analyzed by a handwriting expert who has opined that based upon his comparison of Silveri's signature on the signature page of the Local 32 Agreement with his signature on a number of documents

he admitted signing, that the signature is indeed Defendant Silveri's. *See* Plaintiffs' Ex. 16.

3. The Local 32, like the Local 40 Agreement, contained an Evergreen clause which provided that the Agreement would "remain in full force and effect through June 1, 1989, and from year to year thereafter unless written notice of intent to terminate or modify the Agreement be submitted at least sixty (60) days prior to the expiration date...." [Defendants' Ex. F, p. 20.]

*Insurance Fund et al. v. Robert Silveri d/b/a Silveri Tile Company,* No. 92–76746 (assigned to Judge Cohn). Silveri defended the 1992 action claiming as he does in this matter that he never entered into any Agreement with Local 32. Nonetheless, without admitting liability, in January 1994, Silveri settled the 1992 action and paid the Funds $95,961.00.

After settling the 1992 case, Silveri told Local 32's Business Manager, John Mason, that he was getting out of the tile business. *See* Silveri Dep., Plaintiffs' Ex. 8, p. 8. Based upon that representation, Local 32 did not further pursue Silveri for Fund contributions.

In late 1996, however, John Mason became aware that Silveri Tile Company was performing covered tile work within the Local 32 jurisdiction. An audit of Silveri was subsequently performed in April and May 1998.

That audit revealed that the "d/b/a" Silveri Tile Company had become a corporation, Silveri Tile Company, L.C., in March 1994, shortly after Robert Silveri settled the 1992 lawsuit. The managers of the Silveri Tile corporation are Jean C. Silveri, Robert Silveri's wife, and Mary Lynn Silveri, Silveri's sister-in-law. *See* Plaintiffs' Ex. 9. Although he holds no formal corporate office, Robert Silveri remains the only person authorized to, and who in fact, makes all principal business decisions for the company, including supervising work, and hiring, firing, suspending, laying off, recalling, promoting, discharging, assigning, rewarding and disciplining other employees. *See* Plaintiffs' Ex. 14.

Further, the Silveri corporation continues to perform the same work with the same employees that the d/b/a employed. The audit revealed that in 1994, the corporation had as its employees 10 of the 17 employees who had been employed by the d/b/a Silveri Tile Company in 1992, and 12 of the d/b/a's employees from 1993. Moreover, the corporation operates from the same office that the d/b/a operated out of, and the d/b/a ceased keeping books and records when the corporation's books and records began. *See* Plaintiffs' Ex. 10.

The Silveri Tile corporation also continued to use the same suppliers under the same client numbers as the d/b/a. *See* Plaintiffs' Ex. 11, 12, and 13. The corporation further holds itself out as a continuation of the d/b/a. *See* 1998 advertisement of "Silveri Tile Company" as doing business *"since 1946."* Plaintiffs' Reply Brief Ex. 9.

Although Defendants maintain that they repudiated any agreement they may have had with the Unions "on numerous occasions" since 1985, no letter of termination of any CBA was received by either of the Unions prior to February 3, 1998. *See* Plaintiffs' Ex. 15. Furthermore, as indicated above, documentary evidence of record establishes that Defendants continued to make contributions to the Plaintiff Funds at the rates called for by the CBAs in effect at the time the payments were made throughout the 1985–1992 period. *See* Plaintiffs' Ex. 5 and Plaintiffs' Second Supplemental Ex. 3. Therefore, their claim of having repudiated the contract totally lacks factual support.[4]

---

**4.** The only record evidence of Plaintiffs' repudiation of the CBA is Plaintiffs' Ex. 15 which is a letter dated January 22, 1998 from Defendants' attorneys to B.A.C. Local 32. This letter states, in pertinent part that

Silveri Tile Company, L.C. ("Silveri") does not acknowledge or recognize or agree (for any purposes) that it is either a party to or otherwise bound by the terms of any current collective bargaining agreement with BAC Local 32 or Tile, Terrazzo & Marble Industry Local No. 40.... However, to the

extent the Union claims, believes or perceives that Silveri Tile Company, L.C. is so bound, Silveri hereby gives notice of its unequivocal repudiation of said collective bargaining agreement....

In support of its contention that the Union has been well aware prior to February 1998 that Silveri repudiated any Agreement with Local 32, Silveri points to the affidavit of Robert Wilson, Local 32's assistant business manager, which was submitted to the NLRB in connection with an unfair labor practice

Based upon the audit conducted on its behalf, Plaintiffs contend that Silveri owes contributions for covered work done by tile setters amounting to $682,492.00 and for covered work done by tile helpers amounting to $592,420.29, totaling $1,274,912.29, plus the cost of the audit and the cost and fees incurred in connection with this action.[5]

Silveri's defense in this action is simply that he never signed on to any contract with Local 32 or Local 44 subsequent to December 1991. And, to the extent that Plaintiffs rely upon Silveri's execution of Agreements prior to 1991, Silveri maintains that since he and his company have acted "in open and notorious ways as non-union contractors" and that Local 32 was fully aware of such conduct, he has effectively repudiated any pre–1991 Agreement, and, therefore, is not liable for any contributions to any of the Funds thereunder.

Silveri also argues that since he was never notified by Local 32 or Local 44 that either Union was the successor entity of Local 40 (i.e., the one Union with which Silveri admits having entered into a contract), he cannot be required to make contributions to the successor funds. Additionally, he argues that the Silveri Tile Company corporation formed in 1994 is an entity entirely separate and distinct from his d/b/a on whose behalf he executed the Local 40 Agreement in 1985 and 1987, and because the corporate entity is an entirely separate entity from the d/b/a, it cannot be bound by the d/b/a's execution of the 1985 and 1987 Agreements.

At oral argument, although Defendants did not entirely abandon the foregoing arguments, they retreated somewhat from their original "no-liability-whatsoever" position and argued that assuming that they are liable for the fund contributions sought by Plaintiffs, they should be found to be liable for payment only at the rates provided in Local 40 Agreement signed by Robert Silveri in 1987.

## III. DISCUSSION

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith*

---

charge filed by the Union against Silveri in November 1997. Defendants maintain that Wilson states in that affidavit that Silveri repudiated its contract with Local 32. Defendants misrepresent the contents of Wilson's affidavit. Wilson's affidavit states only that "To my knowledge, *Silveri has taken the position that it does not have a contract with the Union.*" In other words, Wilson indicates he knows that this is Silveri's position, not that Silveri effectively accomplished a repudiation of the Agreement in the manner required. Defendants further fail to point out that Wilson also stated in his affidavit that "Silveri has never given notice to terminate or amend the last collective bargaining agreement that it signed" and that "[i]t is the Union's position that the contract has automatically renewed itself."

5. During the pendency of this action, Silveri Tile was also sued in the U.S. District Court

for the District of Columbia by the Trustees of the Bricklayers International Pension Fund to collect contributions owing to the International Pension Fund (i.e., a Fund separate and distinct from the Tile, Terrazzo and Marble Industry Pension Fund which is a party-plaintiff in this action) pursuant to the 1982–84 CBA between Local 40 and the Detroit Ceramic Tile Contractors Association which Silveri signed on to on June 1, 1985, i.e., the one CBA to which Silveri does not dispute in this action being a signatory. *See Joyce, et al. v. Silveri Tile Company*, 66 F.Supp.2d 1 (D.D.C. 1999). On November 25, 1998, the District of Columbia District Court entered summary judgment in favor of the Plaintiff Pension Fund. *See, Joyce v. Silveri Tile Company, L.C.*, 27 F.Supp.2d 251 (D.D.C.1998). In the D.C. case, Silveri raised, unsuccessfully, all of the same arguments it raises in the instant action. *See* discussion, *infra*.

*Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[6] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

> * Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding the cross-motions for summary judgment in this case.

**B.** *THE "EVERGREEN" CLAUSES IN THE AGREEMENTS SILVERI EXECUTED IN THE 1980s ARE VALID.*

The starting point in this matter is the validity of the "evergreen" clauses in the Agreements to which Silveri was a signatory. As indicated above, the Local 40 Agreement which Silveri signed on to in 1985 and in 1987, provides:

> It is hereby agreed by both parties that this Agreement shall remain in full force and effect until June 4, 1987,[7] and from year to year thereafter unless written notice of intent to terminate or modify the Agreement be submitted, at least sixty (60) days prior to the expiration date by either party to the other.[8]

---

**6.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

**7.** The earlier agreement provided a termination date of June 1, 1984.

**8.** Similarly, the 1988 Agreement between old Local 32 and the Detroit Ceramic Tile Contractors Association states:

The Plaintiff Funds rely upon this "evergreen" renewal clause as the basis for their claims that Silveri is contractually required to make the contributions they seek in this action. Silveri, on the other hand, argues it is not required to make any payments because it never executed any agreement after 1988, and to the extent that Plaintiffs rely upon Defendants' execution of the Agreements in 1985–88, Silveri has openly represented that it repudiated those Agreements.

As a threshold matter, both the Supreme Court and the Sixth Circuit have unequivocally held that automatic renewal or "evergreen" clauses are legally valid. *See, e.g., Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 2140, 141 L.Ed.2d 451 (1998); *Trustees of the B.A.C. Local 32 Insurance Fund v. Fantin Enterprises, Inc.,* 163 F.3d 965 (6th Cir.1998). "When a contract is renewed via the operation of an evergreen clause, all of the attendant contractual obligations naturally continue for the period of renewal." *Id.* at 968–69.

The Sixth Circuit's treatment of the evergreen clause at issue in *Fantin* is instructive. Like Defendant Silveri in this case, the defendant in *Fantin* became a signatory to a collective bargaining agreement entered into between BAC Local 32 and the Detroit Ceramic Tile Contractors Association on September 27, 1991. That agreement contained an "evergreen" renewal clause identical in all material respects to the clauses at issue here.[9]

On November 10, 1992, the Union and the Association entered into a new collective bargaining agreement covering the period from June 18, 1992 through May 31, 1995. Fantin was not a signatory to the new 1992 agreement.

By 1993, there were only two employees left in Fantin Enterprises, Ralph E. Fantin and his son, Ralph B. Fantin. On November 15, 1993, the two Fantins wrote a letter notifying the Union of their intent to resign from the Union effective November 1, 1993. That letter, however, did not state that Fantin Enterprises was terminating its collective bargaining agreement with the Union. On June 29, 1994, Fantin sent a second letter to the Union in which the corporation unequivocally expressed its intention to terminate its association with the Union.

An audit of the company's books was subsequently conducted by the trustees of the plaintiff-funds. That audit revealed that Fantin owed $26,213.74 in fringe benefit contributions. The trustees then sued to recover that amount.

Fantin defended the action contending first that the 1992 agreement to which it was not a signatory superseded the 1991 agreement, and by not signing on to the new agreement when it received it, it effectively gave the Union the 60–days notice of termination required under the evergreen clause. The court disagreed, explaining:

> Unless ambiguous, a collective bargaining agreement is limited to the language contained in its four corners. *The termination clause in the 1991 agreement provides clear, unambiguous terms upon which the contract may be canceled: through written notice by either party of their intent to terminate it.* A careful examination of this agreement reveals no language suggesting that the

---

It is agreed by both parties that this Agreement shall remain in full force and effect through June 1, 1989, and from year to year thereafter unless written notice of intent to terminate or modify the Agreement be submitted, at least sixty (60) days prior to the expiration date by either party to the other.

**9.** The evergreen clause in *Fantin* read as follows:

It is agreed by both parties that this Agreement shall remain in full force and effect through May 27, 1992 and from year to year thereafter unless written notice of intent to terminate or modify the Agreement be submitted, at least sixty (60) days prior to the expiration date by either party to the other.
163 F.3d at 969.

simple existence of a later contract, in which one party was not even involved, could act as the written termination of the 1991 contract. Further, nothing in the 1992 contract suggests that it was meant to serve as written termination of the 1991 agreement. Indeed, "[w]hen such clear and specific language in a labor agreement is at issue, federal courts are uniform in their strict interpretation of such language". This Court would effectively rewrite the terms of these contracts were we to find that the 1992 agreement terminated the 1991 agreement. This we cannot do.

Moreover, Fantin can point to no authority—indeed there is no authority—which supports the proposition that a later agreement, to which the relevant party is not implicated, will act as a notice of termination to an earlier contract entered into by that entity.

*Id.* (citations omitted and emphasis added).

Fantin also argued that it was not responsible for any contributions after November 15, 1993, the date on which the Fantins individually wrote to the Union informing them of their intention to withdraw from the Union. The court rejected that argument as well, finding that notification of intent of individual employees to withdraw from the union was not tantamount to notification of intent to terminate the CBA. *Id.* at 970.

■ *Fantin* makes clear that in this circuit, signatories to a collective bargaining agreement will be bound by the express terms within the four-corners of the agreement as to what is required to provide notice of intent to terminate the CBA. As in *Fantin,* the agreements at issue here require *"written notice* of intent to terminate" the agreement. Defendants in this case do not dispute that no such written notice was ever provided to the Unions until January 22, 1998. That Defendants had allegedly told union representatives who visited Defendants'. job sites that their position was that they had no contract with any union and that the union had protested against Defendants as "non-union contractors" is wholly insufficient to establish repudiation of the CBAs so as to relieve them of their obligation to make contributions to the Plaintiff Funds.[10]

## C. LOCAL 40'S CHANGE OF AFFILIATION, BECOMING B.A.C. LOCAL 44, IS INSUFFICIENT TO RAISE AN ISSUE OF FACT CONCERNING ITS STATUS AS SUCCESSOR–IN–INTEREST WITH RESPECT TO DEFENDANTS' CONTRIBUTION OBLIGATIONS UNDER THE LOCAL 40 CBA.

Silveri also argues that the 1988 dissolution of Local 40's International Union and the Local membership's subsequent affiliation with the Bricklayers and Allied Craftsmen International Union as B.A.C. Local 44 relieved Defendants of all of its contractual obligations with respect to con-

---

**10.** *Fantin*'s holding makes it unnecessary to address Defendants' argument that under the Supreme Court's decision in *Jim McNeff, Inc. v. Todd,* 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983), its agreements with the unions, being "pre-hire agreements" under section 8(f) of the NLRA, were "voidable" and, hence, could be repudiated at any time before the union's majority status was established. In any event, the authorities relied upon by Defendants at pp. 9–15 of their Brief in support of their Motion for Summary Judgment, all address the issue of what constitutes sufficient notice of repudiation *where the pre-hire contract itself contains no provision for formal notice of termination.* In such cases,

"open and notorious acts by one party, known to the other, which are inconsistent with the continuance of the contract" may constitute sufficient notice of repudiation. *Carpenters Local 2247 v. Endicott Enterprises,* 806 F.2d 918, 922 (9th Cir.1986), *cert. denied,* 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 107 (1987); *Contractors Health & Welfare Plan v. Harkins Construction & Equipment Co.,* 733 F.2d 1321, 1326 (8th Cir.1984). However, in this case, we have a contract which has a provision for formal notice of termination: only *written notice* is effective. And, as discussed *supra,* such written notice was not provided until January 22, 1998.

tributions required under the Local 40 Agreement.

Contrary to Defendants' contention, a change in internal structure of affiliation does not necessarily change an employer's obligations with respect to a contract entered into with a predecessor unit. *See, Sullivan Brothers Printers, Inc. v. NLRB,* 99 F.3d 1217 (1st Cir.1996). As the Supreme Court observed in *NLRB v. Financial Institution Employees, Local 1182,* 475 U.S. 192, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986), "The industrial stability sought by the [National Labor Relations] Act would be unnecessarily disrupted if every union organizational adjustment were to result in displacement of the employer-bargaining representative relationship." *Id.* at 202–03, 106 S.Ct. 1007. It is only when (1) the particular affiliation, merger or transfer occurred under circumstances lacking minimal due process safeguards and (2) there is no "substantial continuity" between the pre- and postaffiliation that an employer may be relieved of pre-change-in-affiliation obligations. *Id.,* 475 U.S. at 192, 106 S.Ct. 1007; *Sullivan Printers, supra,* 99 F.3d at 1221.

■ The party seeking to avoid its bargaining obligation by virtue of an affiliation change has the burden of demonstrating that the change was not accomplished with minimal due process. *News/Sun Sentinel Co. v. NLRB,* 890 F.2d 430, 433 n. 4 (D.C.Cir.1989), *cert. denied,* 497 U.S. 1003, 110 S.Ct. 3238, 111 L.Ed.2d 748 (1990).

■ Generally, in determining whether the minimal due process standard is met, courts will look for such safeguards as notice and an adequate opportunity for members to be heard. *Sullivan Brothers, supra,* 99 F.3d at 1222. Informal voting

procedures will meet due process standards so long as the affiliation decision reflects the sentiments of a majority of the employees in the bargaining unit. *NLRB v. Insulfab Plastics, Inc.,* 789 F.2d 961, 965–66 (1st Cir.1986).

Turning to this case, Defendants have not come forward with *any* evidence to suggest that minimal due process requirements were not satisfied in Local 40's change of affiliation decision. On the other hand, Plaintiffs' evidence demonstrates that the strictures of minimal due process were met.

■ Carl Volpe, Local 40's Business Manager, stated in his Affidavit that the decision to change affiliation was effectuated by a letter-vote, i.e., "the overwhelming majority of members of Local 40 signed resignation letters [resigning their membership in the Tile, Marble, Terrazzo, Finishers, Shopworkers & Granite Cutters International Union] and then signed applications to become members of new [B.A.C.] Local 44. [Affidavit of Carl Volpe, Plaintiffs' Response Ex. 4.] John Mason, former President of Local 40, testified in his deposition that prior to the actual change, hearings were held over a period of several months during which hearings, members discussed the affiliation change". [Deposition of John Mason, Defendants' Ex. D, pp. 25–27.] These facts establish that minimal due process requirements were met when the members of Local 40 elected to affiliate with the B.A.C.[11]

■ With respect to the issue of continuity of representation, as with the due process element, the burden is on Defendants to establish lack of continuity of representation. *Insulfab Plastics v. Inter-*

11. To the extent that Defendants also challenge the subsequent merger of the two BAC locals, Local 32 and Local 44, forming what is now known as new Local 32, Plaintiffs have presented evidence demonstrating that due process was also satisfied when that merger decision was made. *See* Plaintiffs' Response Ex. 5.

In any event, the defense of lack of proper successorship is not available in ERISA contribution actions. *See Louisiana Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller General Masonry Contracting Co.,* 157 F.3d 404 (5th Cir.1998);

national Union of Electronic, Elec., Technical, Salaried and Mach. Workers, 274 NLRB 817, 1985 WL 45830 (1985), enforced sub nom, NLRB v. Insulfab Plastics, Inc., supra, 789 F.2d 961.

Whether there is "substantial continuity" of representation requires an examination of the "totality of the circumstances." News/Sun Sentinel Co., supra. Courts generally consider a number of factors, such as structure, administration, officers, assets, membership, autonomy, by-laws and size. Insulfab Plastics, supra, 789 F.2d at 966. Continuity has been found to exist where the structure of the post-affiliation union remains essentially the same and where the organization through its same officers or representatives continues to have primary responsibility for administering the contract. News/Sun Sentinel, supra, 890 F.2d at 432–33.

In this case, as reflected in Carl Volpe's Affidavit, Local 44 covered the same crafts and jurisdictions as former Local 40, represented the same contractors, continued to operate out of the same office that Local 40 did and retained as officers the officers of Local 40. See Paragraphs 8–13, Affidavit of Carl Volpe former Business Manager of Local 40 and Local 44, Plaintiffs' Response Ex. 4. Local 44 also took over responsibility for administering Local 40's contracts. Id. When Local 32 and Local 44 subsequently merged, the only change was to combine the finishers and helpers into one Local to become more efficient and economically feasible. Id. The newly constituted Local 32 covered the same crafts and jurisdiction of Local 44 and Local 32 and represented the same con-

tractors. New Local 32 took over primary responsibility for administering Local 44's and former Local 32's CBAs. Id. Defendants have not come forward with any evidence to contradict Volpe's and Mason's sworn statements.[12]

■ Based upon the foregoing facts, the Court finds that Defendants have failed to demonstrate that an issue of fact exists concerning the decision to change union affiliation such that Defendants may be relieved of their contractual obligations under the Local 40 contract.

D. *SILVERI'S CHANGE IN STATUS FROM A D/B/A TO A CORPORATION DOES NOT RELIEVE THE COMPANY OF ITS CONTRIBUTION OBLIGATIONS UNDER THE CBAs.*

Defendants have also at least implicitly argued that the incorporation of Silveri Tile Company, L.C. in 1994 resulted in the formation of an entirely different company from the d/b/a Silveri Tile Company and, hence, the new incorporated Company cannot be held liable under any contracts executed by the d/b/a.[13] Defendants argument is not supported by the law.

■ In *Fall River Dyeing and Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987), the Supreme Court held that when the business operations remain essentially the same, and a majority of the successor's employees were previously employed by the predecessor, the successor is obligated to abide by the predecessor's obligations under a collective bargaining agreement. In deciding whether the successor is bound to the predeces-

12. Indeed, although Defendants attempt to argue "no substantial continuity," so as to render them liable under the Local 40 contract, the record before the Court establishes that Silveri apparently accepted the fact that Local 44 had stepped into Local 40's shoes with respect to the Tile Contractors Association contract because Silveri made contributions to Local 44's Fringe Benefit Funds after the change in the Local's affiliation, and then made contributions to new Local 32's fund for the same covered employees after the

merger of the helpers/finishers' and setters' locals into new Local 32. See Plaintiffs' Ex. 7 and Plaintiffs' Second Supplemental Ex. 3, 1991–92 reports.

13. Silveri Tile incorporated in March 1994, less than two months after Robert Silveri settled the 1992 B.A.C. lawsuit and informed the union business agent that he was getting out of the tile business.

sor's CBA, the *Fall River* court instructed lower courts to consider the "totality of circumstances." The factors which led the Court in *Fall River* to conclude that the successor company was bound by the predecessor's labor agreement included whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions, under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers. *See also, Forgings Forever, Inc. v. NLRB*, 77 F.3d 482, 1996 WL 82529 (6th Cir.1996) (unpublished opinion; text available on WESTLAW) (successor company held liable under CBA executed by predecessor where successor company began business operations at predecessor's facility; continued the same business operation as that conducted by predecessor; used the same physical facilities and the same equipment, and produced the same product as predecessor; and during the first four months of operation, 90% of the successor's customers were predecessor's customers).

■ Here, the record evidence establishes that the incorporated Silveri Tile Company, L.C. continues to do the same business as Silveri's unincorporated d/b/a, i.e., the installation of ceramic tile; the employees are doing the same jobs in the same working conditions, under the same supervisor, Robert Silveri. Additionally, the incorporated Silveri Tile Company employed a majority of the predecessor's employees when it began operations in 1994. Robert Silveri continues to make all important business decisions for the new company. Further, the L.C. continues, like the d/b/a, to have as its place of business, Robert Silveri's residence. Finally, the same equipment used by the d/b/a is used by the incorporated entity to install ceramic tile.

Under these circumstances, the fact that Silveri changed its status to an incorporated entity does not relieve the company of its obligations under contracts executed by its unincorporated predecessor.

### E. DEFENDANTS ARE PRECLUDED FROM LITIGATING IN THIS ACTION THE ISSUE OF THE RATES OF CONTRIBUTIONS OWING TO THE PLAINTIFF FUNDS

At oral argument and in their post-hearing Supplemental Brief, Defendants argue that even if they are determined to be liable for delinquent contributions, such contributions should be paid to the funds only at the rates called for in the 1987 Local 40 Agreement that Silveri admits signing. However, the issue of the rate at which Silveri is required to make contributions to the B.A.C. pension and benefit funds was fully litigated before, and decided by, the United States District Court for the District of Columbia in *Joyce et al. v. Silveri Tile Company, supra.*

■ Under the doctrine of collateral estoppel, which is also referred to as issue preclusion, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Hammer v. Immigration and Naturalization Service*, 195 F.3d 836, 839–41 (6th Cir.1999), quoting, *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). The doctrine reflects the longstanding policy that one full opportunity to litigate an issue is sufficient. *See, Hickman v. Commissioner*, 183 F.3d 535, 537 (6th Cir. 1999). In federal question actions, the doctrine not only bars a party from relitigating previously decided issues against its former opponent, it also may be used "offensively" to establish the claim of a plaintiff in a subsequent suit who was *not* a party to the prior action. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

■ Although the requirements for collateral estoppel are enumerated differ-

ently in different opinions, the Sixth Circuit has recently stated that the doctrine applies only when (1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation, (2) the issue was actually litigated and decided in the prior action, (3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation, (4) the party to be estopped was a party to the prior litigation (or in privity with such a party), and (5) the party to be estopped had a full and fair opportunity to litigate the issue. *Hammer v. INS, supra; United States v. Real Property Known and Numbered as 415 E. Mitchell Ave.,* 149 F.3d 472, 476 (6th Cir.1998); *Bills v. Aseltine,* 52 F.3d 596, 604 (6th Cir.1995).

As indicated above, the rate of contribution issue was an issue that was necessary and essential in the D.C. lawsuit and was squarely addressed, fully litigated, and ultimately decided in that action. *See, Joyce v. Silveri Tile Company, L.C.,* 27 F.Supp.2d 251 (D.D.C., Nov.25, 1998), and the subsequent January 26, 1999 decision denying Defendant's Motion for Reconsideration, *Joyce v. Silveri Tile Company,* 66 F.Supp.2d 1 (D.D.C.1999).

■ In the D.C. lawsuit, the Court held that, under the Local 40 Agreement Robert Silveri admitted executing and by virtue of the Evergreen ("automatic renewal") Clause in that Agreement, Silveri Tile was required to contribute to the B.A.C. International Pension Fund *"at the rate that was in effect at the time work was performed."* In the D.C. action, just as in this case, Silveri Tile argued that it was only obligated to pay contributions at the rates set forth in the 1987 and 1989 Local 40 Agreements. *See,* January 26, 1999 Memorandum and Order denying Defendant's Motion for Reconsideration, 66 F.Supp.2d 1. The Court specifically rejected that argument and explained in detail the legal rationale for its decision. *Id.* Thus, it is clear that the identical "rate of contribution" issue raised by Defendants in this action was actually litigated and decided in the prior action and the resolution of that issue was necessary and essential to the judgment on the merits entered in the prior litigation.

It is further clear that Silveri Tile had a full and fair opportunity to litigate the contribution rate issue in the D.C. case. Silveri was ably represented and had benefit of live argument by counsel against the International Pension Fund's motion for summary judgment. Moreover, as indicated above, the D.C. Court's opinions reveal that the court was circumspect in its analysis of the effect and applicability of the Evergreen Clause. If Silveri Tile believes error was committed by the D.C. District Court, its recourse lies with the D.C. Circuit Court of Appeals.

■ For all of the foregoing reasons, the Court finds that the doctrine of collateral estoppel applies in this case. Accordingly, Defendants are precluded from litigating the issue of the rate of contribution required of them.[14] That issue was conclusively decided in the D.C. action; Defen-

---

**14.** Defendants argue that the Sixth Circuit's decision in *Trustees of the B.A.C. Local 32 Insurance Fund v. Fantin Enterprises, Inc.,* 163 F.3d 965 (6th Cir.1998) stands for the proposition that when a defendant executes a collective bargaining agreement and that agreement is continued year-to-year thereafter by virtue of an evergreen clause, the defendant is only obligated to make fringe benefit fund contributions at the rate provided in the original agreement he executed. Quoting with liberal ellipses from *Fantin,* Defendants argue that they are only obligated to make contributions at the rates provided within the four corners of the 1987–1989 Local 40 Agreements. However, the rate of contribution was never an issue raised in *Fantin* and the "four corners of the agreement" discussion in the case dealt only with the issue whether notice of intent to terminate an agreement that contained an automatic ("evergreen") renewal clause with specific termination terms could be inferred from a party's failure to execute a subsequent agreement. What the *Fantin* court said was that signatories to a collective bargaining agreement will be bound by the express terms within the four corners of the agreement **as to what is required to provide notice of intent to terminate the agreement.**

dants shall be required to contribute to the Plaintiff Funds at the rates in effect at the time the work was done.[15]

### CONCLUSION

For all of the reason stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment be, and hereby is, GRANTED and Defendants' Motion for Summary Judgment is DENIED.

Let Judgment be entered accordingly.

### JUDGMENT OF LIABILITY

The Court having this date entered an Opinion and Order granting Plaintiffs' Motion for Summary Judgment and denying Defendants' Motion for Summary Judgment; and being fully advised in the premises,

NOW, THEREFORE,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that a JUDGMENT of Liability be and hereby is entered against Defendants Robert Silveri d/b/a Silveri Tile Company and Silvery Tile Company, L.C.

Within 30 days, Plaintiffs shall present to the Court a proposed award of damages, together with a verified and documented affidavit in support of such damages which shall include all delinquent fund contributions due and owing by Defendants to Plaintiffs, and with any liquidated damages thereon, audit costs, accumulated interest, and attorneys fees and costs.

---

**15.** The Court finds Defendants' argument that they should be found to be liable to make contributions only at the rates provided in the Local 40 1987–1989 Agreements particularly specious in light of the fact that the record evidence of this case establishes that Defendants routinely paid the Funds shortly after covered work was done at whatever rate was in effect at the time they made Fund contributions. *See* Plaintiffs' Ex. 7 and Plaintiffs' Second Supplemental Brief, Ex. 3. Indeed, by application of the doctrine of "adoption by conduct" to this evidence of having made previous payments at the rates in effect at the time work was done, Defendants are estopped from denying that they knew that they were obligated to make contributions at the rates in effect at the time work was done. *See, E.S.P. Concrete Pumping, Inc. and Local 47, International Union of Bricklayers and Allied Craftsmen,* 327 NLRB No. 134, 1999 WL 105294 (1999). *See also, Carpenters Amended and Restated Health Benefit Fund v. Holleman Construction Co.,* 751 F.2d 763 (1985); *Arizona Laborers, Teamsters and Cement Masons Local 395 Health and Welfare Trust Fund v. Conquer Cartage Co.,* 753 F.2d 1512 (9th Cir. 1985); *NLRB v. Haberman Construction Co.,* 641 F.2d 351, 355 (5th Cir.1981); *Trustees of International Union of Operating Engineers Local 487 Health and Welfare Trust Fund v. Gimrock Construction, Inc.,* 974 F.Supp. 1455 (S.D.Fla.1997).