John FLYNN, et al., Plaintiffs,

v.

OHIO BUILDING RESTORATION, INC., et al., Defendants.

No. CIV.A. 02–0921RBW.

United States District Court, District of Columbia.

May 7, 2004.

Ira R. Mitzner, Dickstein, Shapiro, Morin & Oshinsky, LLP, Washington, DC, for Plaintiffs.

Richard D. Carter, Carter & Coleman, Alexandria, VA, for Defendants.

### AMENDED MEMORANDUM OPINION

WALTON, District Judge.

This matter is before the Court on Plaintiffs' Motion for Summary Judgment ("Pls.' Mot."). Plaintiffs are the fiduciaries of the Bricklayers and Trowel Trades International Pension Fund ("IPF" or the "Fund"), and have brought this action to enforce the terms of a collective bargaining agreement entered into with defendant Ohio Building Restoration Inc. ("OBR"). Compl.[1] ¶¶ 1, 8, 11. Plaintiffs allege that Exact Construction Services Inc. ("Exact") is the alter ego of OBR, and that Exact has failed to make contributions to the

---

1. References to "Compl." are to the plaintiffs' complaint that was filed on May 10, 2002.

Fund as required by section 515 of the Employee Retirement Income Security Act ("ERISA"), § 29 U.S.C. § 1145. Comp. ¶¶ 1, 9–10. After careful consideration of the record and the applicable legal authority, and for the reasons set forth below, the Court concludes that summary judgment must be entered for the plaintiffs.

## I. Factual Background

The IPF "is an 'employee benefit plan' within the meaning of [the ERISA,] Section 3(3) of 29 U.S.C. § 1002(3), and is a 'multi-employer plan' within the meaning of Section 3(37) of the ERISA, 29 U.S.C. § 1002(37)." Compl. ¶ 3. The Fund "is administered in the District of Columbia." *Id.* ¶ 2. Defendant OBR is a company that "maintain[s] offices and conduct[s] business in the state[s] of Ohio," Michigan, and Indiana and "employs or ha[s] employed members of the International Union of Bricklayers and Allied Craftworkers and its affiliated local unions ("unions")." *Id.* ¶¶ 5, 7; Defs. Opp'n at 10.[2] Defendant Exact, based upon plaintiffs' information and belief, is "an alter ego of OBR, [because, among other things, the two entities allegedly have] interlocking directors, common control, [perform] common type[s] of work and [employ] the same or similar employees." *Id.* ¶ 9.

Plaintiffs brought this action on behalf of the IPF in their role as trustees. *Id.* ¶¶ 1, 3. Pursuant to the "Collection Procedures of the Central Collection Unit of the Bricklayers and Allied Craftworkers ("CCU"), the IPF is authorized to effect [employer] collections on behalf of the International Masonry Institute ("IMI") and the Bricklayers and Allied Craftworkers International Union ("BAC") [and is] authorized to file suit on behalf of the BAC Local 1 Michigan Joint Delinquency Committee ...." *Id.* ¶ 4. Plaintiffs allege that the defendants have failed to make contributions to the Fund as required by the Collective Bargaining Agreement ("CBA") that defendant OBR executed with the unions. *Id.* ¶¶ 8, 11. Specifically, plaintiffs allege that defendant Exact, as OBR's alter ego, "was obligated to make certain payments to the IPF, IMI, BAC and Local Funds on behalf of employees covered by the Agreement" and has failed to do so. *Id.* ¶¶ 9–10. Based on the allegation that Exact is the alter ego of defendant OBR, plaintiffs seek an order declaring that both OBR and Exact "are jointly and severally liable for all amounts owed to the IPF, IMI, BAC and Local Funds." *Id.* ¶ 1, at 5.

### A. Plaintiff's Arguments in Support of Summary Judgment

Plaintiffs have filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, in which they argue that they are entitled to judgment in their favor as a matter of law on the grounds that there is no genuine issue of material fact remaining to be resolved in this matter. Fed.R.Civ.P. 56. Plaintiffs assert that in reviewing this matter the Court need only focus on whether OBR and Exact "share [common] ownership, management, business purpose, operation, equipment, supervision, and work force." Pls.' Mem.[3] at 7–8 (citing *Greater Kansas City Laborers Pension Fund v. Thummel,* 738 F.2d 926, 929 (8th Cir.1984)). Plaintiffs argue that the evidence in the record related to all of these factors supports a finding that Exact is the alter ego of OBR. As an example offered in support of its position, plaintiffs note that, according to the defen-

---

2. References to "Defs.' Opp'n" are to Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment, filed August 11, 2003.

3. References to "Pls.' Mem." are to Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Judgment, filed June 30, 2003.

dants' answers to interrogatories, "Ohio Building ... was owned by Duane Haas while Exact was owned by Duane Haas' wife, Debra, and the Vice President of Ohio Building, John Hall." *Id.* at 9; Exhibit ("Ex.") H (Defendants' Objections and Answers to Plaintiffs' First Interrogatories and Requests for the Production of Documents) ("Defs.' Ans.") No. 9. Moreover, plaintiff points out that by her own admission, Ms. Haas acknowledges that she was designated by her husband to be a fifty percent owner of Exact "to be ... his person[ ]" at Exact. *Id.* at 19; Pls.' Mot., Ex. E (deposition of Debra Haas, dated May 12, 2003) ("Debra Haas Dep.") at 19–20. According to plaintiffs, it is undisputed that John Hall had the "authority to hire and fire employees at both Ohio Building and Exact." *Id.* at 10; Ex. H, Ans. No. 9. Plaintiffs further note that both companies have performed restoration contractor services in the same geographic regions at the same times. Pls.' Reply[4] at 4–5; *but see* Defs.' Opp'n[5] at 11. OBR leases adjoining properties located in Toledo, Ohio, at 830 Mill Street and 726 Stanton Street, from an entity known as the Debra Haas Trust, and in turn subleases the 726 Stanton Street property to Exact. Pls.' Mem. at 14. Similarly, OBR leases its Detroit office from the same trust and leases storage space to Exact at that location. *Id.* Furthermore, OBR and Exact utilized the same controller, accountant, attorney, insurance company, and bank, Pls.' Mem. at 12, 15; Pls.' Mot., Ex. C (deposition of David E. Shultz, dated April 12, 2003) ("Shultz Dep.") at 50, 71, 72, 73; Pls.' Mot., Ex. B (deposition testimony of John Hall, dated April 9, 2003) ("Hall Dep.") at 89–90, the corporate business records for both corporations were maintained at the same location, Pls.' Mem. at 15; *see also* Defs.' Opp'n at 14–15, and many employees have performed work for both OBR and Exact during the same year and several painters have done so within the same pay period, Pls.' Mem. at 11; Pls.' Mot., Ex. C (Shultz Dep.) at 53–55. Moreover, plaintiffs state that "[m]ost damning to Defendants' efforts to avoid liability are the Defendants' own admissions that Exact was formed *for the specific purpose of creating an anti-union business* and that Duane Haas could not be as involved in the business because his company, Ohio Building, was bound by the collective bargaining agreement." Pls.' Mem. at 18; Pls.' Mot., Ex. D (deposition of Duane Haas, dated May 12, 2003) ("Duane Haas Dep.") at 45–46 (emphasis in original).

## B. Arguments Opposing Summary Judgment

Not surprisingly, defendants characterize their relationship in a much different light than their adversaries. First, defendants assert that the relevant factors to be considered in making an alter ego determination in this Circuit are whether the corporations in question enjoy "interrelated operations, common management, centralized control over labor relations, and common ownership." Defs.' Opp'n at 6 (citing *Sheet Metal Workers Union 102 v. Gibson Brothers,* No. Civ. A. 82–0329, 1982 WL 2079, at *3 (D.D.C. Oct. 27, 1982)). Defendants assert that although they maintain a close working relationship due to their principal officers' long standing friendships, their respective corporations do not have interrelated operations. Defs.' Opp'n at 9. Defendants emphasize that OBR has

**4.** References to Pls.' Reply are to the Reply Memorandum in Support of Plaintiffs' Motion for Summary Judgment, filed September 8, 2003.

**5.** References to "Defs.' Opp'n" are to Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment, filed August 11, 2003.

and continues to focus its resources on masonry projects, while Exact was formed with the purpose of competing for jobs installing traffic bearing membranes, and other commercial flooring and waterproofing systems, *id.* at 10; Defs' Opp'n, Ex. 1 (Duane Haas Dep.) at 48; Defs' Opp'n, Ex. 3 (Hall Dep.) at 107–108, and have maintained arms-length distance on each of the transactions into which their two corporations have entered. Def.'s Opp'n at 9. Defendants contend that "OBR works primarily in northeast Ohio, southeast Michigan, and northeast Indiana, while Exact does almost all of its work in Columbus, Ohio." Defs.' Opp'n at 10; *but see id.* at 11 (chart showing that the two organizations have performed work in the same regions during the same times). Defendants emphasize that contrary to plaintiffs' assertions, "Exact's lease of a small space in OBR's [main office] does not constitute 'maintaining common offices.' " *Id.* at 14. Defendants state that although the two corporations have established a substantial amount of goodwill between themselves, they have always maintained the proper economic distance between each other and held steadfast to the requisite formalities for maintaining separate corporate entities. *Id.* at 16–17. Defendants concede that John Hall is a common figure to the management of both corporations, but maintain that all other members of their respective management teams have never been in a position to exercise control over the labor and resources of both corporations at the same time. *Id.* at 18.

Defendants further argue that even if this Court were to find that they did in fact constitute a "single employer or alter ego," the Court would still need to decide whether or not Exact's employees are a part of the appropriate bargaining unit for the purpose of applying the CBA. *Id.* at 34–35. Stated differently, defendants assert that the Court must determine whether their respective labor forces have a common "community of interests" which could be fairly represented by the plaintiffs, *id.*, which defendants contend is not the case.

## II. Analysis

### A. Standard of Review

As previously indicated, this matter is currently before the Court on plaintiffs' motion for summary judgment. Federal Rule of Civil Procedure 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The entry of summary judgment is appropriate after there has been an "adequate time for discovery ... [and the] party [against whom the motion has been filed] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ...." *Id.* at 255, 106 S.Ct. 2505. When reviewing the evidence, the Court must draw "all inferences ... in favor of the nonmoving party[.]" *Coward v. ADT Security Systems, Inc.,* 194 F.3d 155, 158 (D.C.Cir.1999); *Aka v. Washington Hosp. Center,* 156 F.3d 1284, 1295 (D.C.Cir.1998).

## B. Alter Ego Analysis

### (1.) Applicable Standard in Determining Defendants' Alter Ego Status.

 The plaintiffs' claim arises under § 515 of the ERISA[6]. 29 U.S.C. § 1145. This provision imposes a federal obligation on employers to contribute to a multiemployer pension fund if an employer is required to do so pursuant to the terms of a collective bargaining agreement or multiemployer plan. The provision states:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with the law, make such contributions in accordance with the terms and conditions of such plans or such agreement.

§ 29 U.S.C. § 1145. The alter ego doctrine, upon which plaintiffs' argument rests, "is meant to prevent employers from evading their obligations under labor laws and collective bargaining agreements through the device of making 'a mere technical change in the structure or identity of the employing entity ... without any substantial change in its ownership or management.'" *Massachusetts Carpenters Central Collection Agency v. Belmont Concrete*, 139 F.3d 304, 307 (1st Cir.1998) (quoting *NLRB v. Hospital San Rafael, Inc.*, 42 F.3d 45, 51 (1st Cir.1994) (quoting *Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 259–61 n. 5, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974))). While "the alter ego doctrine is primarily applied to situations involving successor companies, 'where the successor is merely a disguised continuance of the old employer, ... it also applies to situations where the companies are parallel" operations. *Belmont*, 139 F.3d at 307 (citations omitted).

The District of Columbia Circuit recently addressed the alter ego doctrine in a context similar to the one currently before the Court. *See Flynn v. R.C. Tile*, 353 F.3d 953 (D.C.Cir.2004). *R.C. Tile* involved a series of family owned, unincorporated, tile installation businesses. 353 F.3d at 956. Majestic Tile was started by Joseph Flores in 1970. *Id.* Joseph's brother Richard worked with him setting tile in that business until 1995, when the business was closed due to problems with the Internal Revenue Service. *Id.* In 1995, Richard Flores started R.C. Construction. *Id.* The unincorporated business was technically in Richard's name, however, his brother Joseph continued to manage the operations of the new business, while Richard continued his role of setting tile. *Id.* Joseph's wife Priscilla worked at R.C. Construction, managing its office and finance operations. *Id.* In 1996, R.C. Construction entered into a collective bargaining agreement with the local affiliate of a national union that contained a provision requiring it to contribute to the pension plans of its covered employees. *Id.* R.C. Construction ceased doing business in 1997, and failed to give the pension fund notice of its intention to withdraw from the CBA. *Id.* Thereafter, R.C. Tile was created as an unincorporated entity by a third Flores brother, Jesse, who joined Richard in the field setting tile while Joseph and his wife managed the operations of the business. *Id.* The plaintiffs, fiduciaries of the employee pension fund, sued shortly thereafter, alleging that R.C. Tile was the alter ego and successor of R.C. Construction with whom the plaintiffs had executed the collective bargaining agreement that required R.C. Construction to contribute to the pension plan of its employees. *Id.* at 957. In determining that R.C. Tile was the alter ego of R.C.

---

**6.** The MPPAA was enacted in 1980 to amend ERISA §§ 1001—1461. *See Massachusetts Carpenters Central Collection Agency v. Bel-* *mont Concrete,* 139 F.3d 304, 305 (1st Cir. 1998).

Construction, the Court considered the following factors: "ownership, management, business purpose, operations, equipment, and customers." *Id.* at 958. In addition, the Court noted it would "also look at any transactions and other dealings between the two entities." *Id.* However, the Court observed "[n]o single factor is controlling, and all need not be present to support a finding of alter ego status." *Id.* (quoting *Belmont,* 139 F.3d at 308). In analyzing these factors, the Court concluded that R.C. Tile was undoubtably R.C. Construction's alter ego and as such was required to adhere to the provisions contained in the collective bargaining agreement as if it had been a signatory to the agreement. *Id.* at 959–960. In reaching this conclusion, the Court found that the entities were both in the business of laying tile in the public works sector of the construction industry; they both operated in the southern Californian region; they were successively owned by members of the Flores family; the assets of the companies were essentially the same and were not transferred between each other in arms-length transactions; R.C. Tile had assumed work that R.C. construction had not completed; R.C. Tile had hired several of R.C. Construction's former employees; and, the business and financial operations of each entity were controlled by the individual who owned the initial business and his wife. *Id.* at 959. While the Court in *R.C. Tile* found these factors to be relevant in analyzing the situation before it, the Court cautioned that "different considerations may be relevant where a corporation is involved." *Id.* at 958 n. 3 (citing *Greater Kansas City Laborers Pension Fund v. Superior General Contractors, Inc.,* 104 F.3d 1050, 1055 (8th Cir.1997)).

In *Superior General,* the Eighth Circuit had before it a situation similar to this case and held that an incorporated entity was not the alter ego of its corporate co-defendant. *Superior General,* 104 F.3d at 1058. In *Superior General,* the plaintiffs, fiduciaries of several employee trust funds, sued the defendants, Bohnert Construction Company, Inc. ("New Bohnert") and Superior General Contractors, Inc. ("Superior General"), for unpaid contributions pursuant to § 502(g)(2) and 515 of the ERISA. *Id.* at 1053. Superior General had been formed in 1988 by several employees who had worked for the predecessor company of Bohnert ("Old Bohnert") and its owner, Al Bohnert. *Id.* Al Bohnert, the founder of the predecessor company (Old Bohnert), helped his former employees start Superior General, and was its majority stockholder. However, one of Al Bohnert's former employees "made all decisions concerning [Superior General's] daily operations, and directed [its] labor relations." *Id.* at 1052–53. In 1989, Superior General signed a "contract stipulation" that obligated itself to be governed by a collective bargaining agreement, which required employers to make contributions to employee benefit plans on behalf of employees covered by the agreement. *Id.* at 1053. However, in 1992 Superior General ceased doing business, and ceased making contributions to the employee benefit plans. *Id.* Prior to Superior General's demise, Al Bohnert incorporated Bohnert, and his unincorporated predecessor company (Old Bohnert) transferred all of its general contracting business to the new incorporated entity. *Id.* While the predecessor company (Old Bohnert) continued in existence the scope of its operations was greatly diminished. *Id.* Plaintiffs filled suit shortly thereafter alleging that Bohnert was the alter ego of Superior General, and as such, was bound by two collective bargaining agreements to which Superior General was a signatory employer[ ], and was therefore obligated to make the employee benefit plan contributions Superior General was obligated to make. *Id.* The Eighth Circuit affirmed the District

Court's conclusion that Bohnert was not the alter ego of Superior General. *Id.* at 1058. However, in reaching this conclusion, the Eighth Circuit utilized a different formulation of the alter ego test than the test employed by the District Court.[7] *Id.* at 1055. While the District Court looked to the lack of commonality between the two corporations' (1) ownership, (2) management, (3) supervision, (4) business purpose, (5) operations, (6) customers, and (7) equipment, and (8) the extent to which the closing of Superior General was motivated by anti-union animus [8], the Eighth Circuit applied more restrictive traditional corporate law principles in making its alter ego assessment. *Id.* (citing. *In re B.J. McAdams, Inc.*, 66 F.3d 931, 937 (8th Cir. 1995)). The Eighth Circuit noted that the alter ego doctrine as developed in the corporate law context provides that the legal fiction of a separate corporate entity may be rejected in the case of a corporation that

> (1) is controlled by another to the extent that it ha[s] independent existence in form only and (2) "is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetrate a fraud. Thus, control by one company over its alleged alter ego is necessary under the corporate law standard."

*Superior General*, 104 F.3d at 1055 (citations omitted). The *Superior General* Court's reasoning for applying the corporate law test was that:

> Although the underlying congressional policy behind ERISA favors the disregard of the corporate entity in situations where employees are denied their pen-

sion benefits, such policy interests are not implicated in the present case, which does not involve an individual pensioner's claim for benefits; rather, it involves a pension fund's attempt to collect unpaid contributions.... Moreover even if such interests were at stake in the present case, we believe the corporate law standard for determining alter ego status strikes the appropriate balance between the congressional intent of ERISA and the long established principle that a corporation's existence is presumed to be separate and may be disregarded only under narrowly prescribed circumstances.

*Id.* at 1055 (citations omitted).

In *Massachusetts Carpenters Central Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304 (1st Cir.1998), which the Court in *R.C. Tile* cited in comparison to *Superior General*, the First Circuit had occasion to address issues similar to those presented in this Court case. The plaintiff in *Belmont* was the fiduciary responsible for the collection of union employee benefit funds and the defendants were both incorporated concrete construction contractors (Belmont Concrete and Algar Construction). *Id.* at 305. Algar was established in 1990 by the Bota, Guerreiro, and Dias families. *Id.* at 306. Two years later, in 1992, members of these same families started Belmont. *Id.* While the companies were technically owned by various female family members, the District Court concluded that the control of both corporations rested squarely in the hands of, and was exercised by, the patriarchs of the

---

**7.** The test which the District Court borrowed from *Iowa Express Distribution, Inc. v. NLRB*, 739 F.2d 1305, 1310 (8th Cir.1984), is identical to the test used by the First Circuit in *Belmont*, 139 F.3d at 308.

**8.** As discussed *infra* at 31–32, anti-union animus, or an employer's desire to deny a union

the benefits of the bargain struck in a collective bargaining agreement, is a factor that may be relevant when assessing alter ego status, however, a finding of the existence of this factor is "not essential." *See R.C. Tile*, 353 F.3d at 960 (explaining the applicability of anti-union animus in this Circuit).

three families. *Id.* In 1993 Belmont entered into an agreement with a union, which compelled Belmont's adherence to the terms and conditions of various local unions' collective bargaining agreements. This in turn obligated Belmont to make contributions to union employee benefit funds on behalf of its covered employees. *Id.* at 307. Less than a year later, Belmont ceased doing business and the plaintiff filed suit shortly thereafter, alleging that Algar was obligated to make the employee benefit fund contributions on behalf of Belmont's employees as the alter ego of Belmont. *Id.* at 305. The District Court agreed with the plaintiff. *Id.* at 305, 307. In upholding the District Court's decision, the First Circuit concluded that Algar was indeed the alter ego of Belmont, relying on the following factors: the companies were commonly owned by the three families; Messrs. Bota, Guerreiro, and Dias all exercised control over the day-to-day operations of the companies and supervised the companies field operations interchangeably; the companies had identical business purposes which were performed in the same state; they utilized many of the same employees; they had their offices at the same location; provided services for many of the same customers; and, the companies shared equipment. *Id.* at 309. Finally, although the District Court had suggested the existence of anti-union animus, the First Circuit declined to address this question, concluding that the evidence as a whole was "sufficient to support the conclusion that a reasonable finder of fact would have concluded that Algar [was] Belmont's alter ego[ ]" and therefore "[a] finding of anti-union animus [was unnecessary]." *Id.*

The District of Columbia Circuit has not yet addressed which test or standard for assessing alter ego liability in the corporation context is applicable in this Circuit. As noted above, the Circuit Court recently opined that "[d]ifferent considerations *may* be relevant where a corporation is involved," citing *Superior General* and *Belmont* as cases that have taken the two different positions. *R.C. Tile,* 353 F.3d at 958 n. 3 (emphasis added). This Court must therefore make that determination.

■ As mentioned above, the defendants have suggested that this Court should apply the test used in *Sheet Metal Workers Union 102 v. Gibson Brothers,* No. Civ. A. 82–0329, 1982 WL 2079, at *3 (D.D.C. Oct.27, 1982). In *Gibson Brothers,* a former member of this Court considered whether the corporations in question enjoyed (1) interrelated operations, (2) common management, (3) centralized control over labor operations, and (4) common ownership in determining whether the non-signatory corporation could be held liable under the ERISA for the contractual obligations of the related signatory corporation. *Id.* (noting that these "criteria were originally invoked for collective bargaining unit determinations, not joint employer status for the purpose of determining ... whether one employer is the same or 'alter ego' of the other"). Concluding that the plaintiffs had failed to demonstrate for summary judgment purposes that the signatory corporation was "either a joint employer of [the non-signatory corporation's] employees, or ... [was] an alter ego corporation[,]" *id.* at *7, the *Gibson Brothers* Court stated that "[p]erhaps the most important ... criteria for a finding of joint employer [or alter ego corporation] liability is the degree of control exercised by the nominally independent corporation over the labor relations policies affecting the employees expressly subject to the collective bargaining agreement." *Id.* at *5. However, the Court went on to hold that it would have to also "find that that failure to disregard the separate existence of the non-signatory corporation would result in substantial

fraud or injustice[ ]" to hold that such liability existed. *Id.* at *6. Thus, the *Gibson Brothers* Court seemingly adopted the Eighth Circuit's more restrictive corporate law test, as it applied what essentially became the second prong of that test as articulated in *Superior General.* 104 F.3d at 1055 ("The legal fiction of the separate corporate entity may be rejected in the case of a corporation that . . . (2) is used as a subterfuge to defect public convenience, to justify wrong, or to perpetrate a fraud."). But *Gibson Brothers* was decided without the guidance now provided by the Circuit Court in *R.C. Tile,* which adopted the factors deemed relevant to the alter ago assessment applied by the First Circuit in *Belmont. R.C. Tile,* 353 F.3d at 959. And, the *Belmont* Court specifically rejected the argument "that wrongful motive is a sine qua non for finding alter ego status in an ERISA case." *Belmont,* 139 F.3d at 308. While the Court in *R.C. Tile* did not have to decide whether wrongful motive is essential to an alter ego finding, this Court is confident that if and when it will have to do so, the District of Columbia Circuit will side with the First Circuit. This sense of confidence is derived from the Court's rejection in *R.C. Tile* of the argument that alter ego status cannot be established in the absence of "anti-union animus," *R.C. Tile,* 353 F.3d at 960, which the Court finds analogous to a claim that alter ego status cannot be demonstrated because wrongful motive is lacking.[9] Accordingly, the Court rejects defendants' position that they cannot have alter ego status because plaintiffs have not established that Exact was created to evade the obligations of the CBA.

■ Further reason for concluding the *R.C. Tile—Belmont* approach is the correct standard for this Court to apply in this case is found in the text of the *R.C. Tile* opinion where the Court discusses the rationale for imposing the alter ego liability in the ERISA context. This result is called for despite the *R.C. Tile* Court's statement that "[d]ifferent considerations *may* be relevant where a corporation is involved." *Id.* at 958 n. 3. In this same footnote, the Circuit Court commented that in *Belmont* the First Circuit applied the same "criteria" it deemed relevant in making the alter ego determination in the non-corporate setting, as it also did in the corporate context. *Id.* Significant to the Court's conclusion that different considerations should not be employed here because corporations are involved, at least not based on the record in this case, is the fact that this case, like *R.C. Tile,* concerns a " 'multi-employer plan' within the meaning of . . . ERISA . . ." Compl. ¶ 3; Plaintiffs' Rule 7.1(H) Statement of Material Facts as to Which There is No Genuine Issue ("Pls' Facts") ¶ 1; Defendants' Rule 7.1(H) Statement of Issues to Which There is a Genuine Issue to be Litigated, Ex. 10. As explained in *R.C. Tile,*

> "Section 515 [of the Multi-employer Pension Plan Amendment Act of 1980, 29 U.S.C. § 1145] was a response to the problem created when an employer defaults upon its obligation to fund a multi-employer defined-benefit pension plan: If one employer does not make its contributions to such plan, then the other participating employers must make larger contributions to cover the shortfall."

*R.C. Tile,* 353 F.3d at 958 (citation omitted). Moreover, "[t]he funding burden

---

9. The *R.C. Tile* Court noted, however, that "[a]nti-union animus may be a reason one entity should be deemed the alter ego of another for the purpose of assigning liability under ERISA, but [emphasized that] the absence of anti-union animus certainly does not establish that two entities are not alter egos." *R.C. Tile,* 353 F.3d at 960.

may be shifted beyond other participating employers to taxpayers *via* the Pension Benefit Guaranty Corporation, and to beneficiaries in the form of reduced pension benefits." *Id.* (citation omitted). These potential consequences underlie the enactment of § 515, which "evinces a strong congressional desire to minimize contribution losses and the resulting burden such losses impose upon other plan participants." *Id.* (citation omitted). The statute places multi-employer plans in a better position than they were before its adoption because "it facilitates recovery of contributions from delinquent employers and by limiting the defenses available to an employer in an action brought to enforce the obligation created by § 515." Application of "[a]lter ego liability under § 515 further protects the federal interest in the solvency of the multi-employer pension plans by enabling ERISA trustees to recover delinquent contributions from a sham entity used to circumvent the participating employer's pension obligations." *Id.* (citing *Belmont,* 139 F.3d at 305 n. 3).

Here, some of the employee benefit contributions OBR was obligated to make were pension funds. Pls' Facts ¶ 2. And the policy reasons for § 515's enactment apply equally regardless of whether an employer is incorporated or not. The Court can therefore discern no reason why the test for determining alter ego status should be any different. Accordingly, the Court will apply the *R.C. Tile* factors in this case.

### (2.) Whether Exact is OBR's Alter Ego

■ As noted above, in determining whether Exact is the alter ego of OBR, the Court must consider "the similarities between the two enterprises in their ownership, management, business purpose, operations, equipment, and customers." *R.C. Tile,* 353 F.3d at 958. In addition, the Court can consider "any transactions or other dealings between the entities." *Id.* " 'No single factor is controlling and all need not be present to support a finding of alter ego status[.]' " *Id.* (quoting *Belmont* at 308).

■ Defendants' primary argument in opposition to plaintiffs' similarities in ownership position is that none of the owners of Exact have any ownership interest in OBR. Defs.' Opp'n at 22–25. While this may be true in a technical sense, it does not accurately reflect the reality of the situation. It is undisputed that all of Exact's stocks are equally owned by OBR's vice president, John Hall, and the wife of OBR's owner and president, Debra Haas. Pls.' Mem., Ex. H (Defs.' Ans.) No. 9. There is also no dispute about the fact that the money Ms. Haas used to invest in Exact came from her and her husband's joint checking account. Pls.' Facts, Ex. D (Duane Haas Dep.) at 45. While defendants contend that Mr. Haas did not have any interest in or control over Exact, Ms. Haas herself has admitted that she was designated by her husband to represent him in the business. Pls.' Mot., Ex. E (Debra Haas Dep.) at 19–20. The Court cannot ignore this telling statement, despite the contrary spin defendants advance in their opposition. Defs.' Opp'n at 18 (asserting that "Mr. Haas has full ownership of OBR, but no ownership interest or financial control over Exact."). This statement, coupled with the fact that marital funds of the Haas' were used to purchase Exact, conclusively establishes that Duane Haas has an ownership interest in Exact, regardless of how defendants try to characterize the situation. *See Vance v. NLRB,* 71 F.3d 486, 492 (4th Cir.1995) (common ownership determination of two entities by the NLRB as part of single employer finding upheld because "initial funding of one entity from a joint husband wife account and the continuing involve-

ment of one spouse in both enterprises sufficiently demonstrated the presence of common ownership.") (citing *H.A. Green Decorating Co.*, 299 N.L.R.B. 157, 163, 1990 WL 123346 (1990), enforced, 983 F.2d 1073 (7th Cir.1992); *see also Adams v. Chambers*, 82 Ohio App.3d 462, 612 N.E.2d 746 (Ohio Ct.App.1992)) (property acquired by use of funds from spouses' joint account during marriage is marital, not separate property) (citation omitted).[10] Accordingly, common ownership of both OBR and Exact lies with Duane Haas.[11]

Similarities in the management of OBR and Exact further supports plaintiffs' position. As accurately noted by plaintiffs, "[n]ot only was there significant overlap in the directors, officers and managers of the two companies, but the individuals filling these roles exercised similar authority and performed similar roles at each company." Pls.' Mem. at 10. Defendants admit that John Hall is the Vice President of OBR and the President of Exact, Defs.' Opp'n at 18, and therefore has management responsibilities for both entities. Pls.' Facts, Ex. B at 9–12. Debra Haas is the secretary for both corporations. *Id.* Hall and Mrs. Haas both had authority to sign documents on behalf of each company. Pls.' Facts, Ex. B (Hall Dep.) at 94–95; Ex. E (Debra Haas Dep.) at 13. David Shultz acted as the controller for both entities. Defs.' Opp'n. at 18–19. Moreover, Hall and Shultz were listed on the signature card of each of the entities' National City Bank accounts. Pls.' Facts, Ex. H (Defs.' Ans.) No. 6. Also of significance, defendants ac-

knowledge that Hall possessed the authority to hire and terminate employees at both OBR and Exact. *Id.* No. 9.

The business purposes of OBR and Exact overlap significantly. Defendants contend otherwise, positing that OBR's focus has traditionally been on masonry activities, while Exact was incorporated to do industrial flooring work, Defs.' Opp'n at 10, which defendants submit "was not a significant portion of the services performed by OBR at the time Exact was incorporated in 1998, *id.; see also* Pls.' Mem. at 12; Defs.' Facts ¶ 13. However, defendants concede that OBR was doing some flooring work when Exact was established, and admits that "OBR ... [began] to move into that area more aggressively over the past several years." Defs.' Opp'n at 10; Pls.' Facts, Ex. B at 98–99. Both companies performed flooring work at the same time, Pls.' Facts, Ex. D at 98, and when Exact ceased performing such work OBR assumed the flooring projects Exact had been working on and has filled the void left by Exact's departure from the field, *id.* At the time Exact came into being, and thereafter, OBR performed masonry restoration work, in addition to the application to masonry surfaces of a special coating and paint. Pls.' Facts, Ex. B at 76. Interestingly, after Exact's creation it expanded the scope of its work into the areas of "concrete restoration and coating, caulking, cleaning and waterproofing." *Id.* at 76–77. Moreover, the bulk of the work performed by the two companies while

---

10. Although it is not absolutely clear from the record where the Haas' reside, it appears they reside in Ohio and therefore the law of Ohio seemingly would control whether Duane Haas has an ownership in Exact. In any event, it is a universal principle of domestic relations law that property acquired by one spouse during a marriage is generally considered marital property, Joyce Hens Green, John V. Long & Robert Marawski, Dissolution of Marriage, § 10.03 at 364 (1986) ("*marital property* ...

generally includes all property acquired during the marriage ...*"*), especially when it was acquired with funds from the spouses' joint accounts.

11. If OBR was acquired by Duane Haas during his marriage to Debra Haas, common ownership of both entities would also lie with Debra Haas. There is nothing in the record on this point.

they were simultaneously operating occurred in the same general geographic area—Michigan and Ohio. Defs.' Opp'n at 11. In fact, on a number of occasions, the defendant companies worked on the same projects during the same year. *See* Pls.' Mem. at 13.

The operations of OBR and Exact are also closely related. For example, at least 25 individuals have worked for both OBR and Exact. Pls.' Facts, Ex. J. Of these 25 individuals, 24 worked for both companies during the same year. *Id.* In fact, some employees received weekly paychecks from both OBR and Exact "in the same envelope." Pls.' Facts, Ex. F at ¶ 5; *see also* Pls.' Facts, Ex. C at 52–53. It is significant that some of these twenty-five employees were masonry workers. Pls.' Facts, Ex. C at 101–102. Also critical is the acknowledgment by one employee (John Hall) that he has worked for both companies on the same days, work which included giving estimates to prospective customers and making bids to obtain work for the two companies to perform. Pls.' Facts, Ex. B at 15–16.

The two entities have also maintained offices at the same location. Pls.' Facts, Ex. H at No. 3. On two occasions Exact leased office space from OBR, Pls.' Facts, Ex. D at 16, which was done without the execution of a written lease. Pls.' Facts, Ex. C at 28. Service of process in this litigation was also accepted by the same individual at the same location on behalf of both OBR and Exact. Pls.' Facts, Ex. I.

Extremely informative of the nature of defendants' relationship is the fact that the two entities transferred funds to each other and loaned money to one another on a number of occasions. Pls.' Facts, Ex. C at 75–78; Ex. H at No. 13. And interestingly, except for accounting entries that were entered on the companies' internal books, the paper work normally associated with such transactions was never generated.

Pls.' Facts, Ex. C at 79–80. In addition, neither company engaged in similar transactions with any other entities. *Id.*

Further, both companies have used many of the same service providers in conducting their business. They use the same accountant; Pls.' Facts, Ex. D at 61; they are using the same law firm in this litigation; Pls.' Facts, Ex. B at 89–90; they maintain accounts and lines of credit at the same bank; Pls.' Facts, Ex. H at Nos. 5–6; and, both companies' retirement and health insurance plans and their workers' compensation insurance are maintained through the same entities. *See* Pls.' Mem. at 15.

All of the *R.C. Tile* factors therefore weigh in favor of a finding that an alter ego relationship exist between OBR and Exact. Although ownership of Exact is officially registered to Debra rather than Duane Haas, as demonstrated above common ownership of the two entities lies with Duane Haas. They shared management personnel who performed the same duties for each company. They have essentially provided the same type of construction services, and when Exact stopped doing industrial flooring work OBR assumed Exact's obligations and became an active participant in that field. *See R.C. Tile,* 353 F.3d at 959 (finding an alter ego relationship where "[o]n several occasions R.C. Tile assumed R.C. Construction's subcontracts and completed work begun by R.C. Construction."). They also simultaneously operated in the same general geographic area (Ohio and Indiana). A number of employees (25) have worked for both companies, several working for both during the same week. And several of these employees performed the same work for the two entities. *Id.* (R.C. Tile employed many of the tile-setters who work for R.C. Construction.). The companies have had offices at the

same location at the same time. In addition, OBR has leased office space to Exact without executing written lease agreements. *See Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.,* 872 F.2d 702, 705 (6th Cir.1988) (failure to respect formalities in dealings between individuals and wholly owned company is indicative of alter ego status) (cited in *R.C. Tile,* 353 F.3d at 961). The two entities transferred funds to each other and made loans to each other without the documentation normally associated with such transactions. *See id. R.C. Tile,* 353 F.3d at 959 ("The assets were transferred among [the companies] in non-arms length transactions, which provides a 'clear foundation for a holding of 'alter ego' status.'") (citing *Central States, Southeast & Southwest Areas Pension Fund v. Sloan,* 902 F.2d 593, 597 (7th Cir.1990)). Finally, they have also used the same service providers in the operation of their businesses. All of these findings, which are based on undisputed record evidence, conclusively indicate that alter ego status exists between OBR and Exact.[12] *See e.g., R.C. Tile,* 353 F.3d at 959–60; *C.E.K. Industrial Mechanical v. NLRB,* 921 F.2d 350, 355 (1st Cir.1990).

## C. Exact's Obligation to Comply with the Collective Bargaining Agreement

■ The parties disagree about what the Court's next step is upon having concluded that alter ego status exist between OBR and Exact. Plaintiffs argue that this finding automatically obligates Exact to make the employee contributions to the Fund as required by the CBA to which

OBR is a signatory. On the other hand, defendants opine that the Court must now assess whether OBR and Exact constitute a single employer and whether the two entities' employees constitute a single appropriate bargaining unit, before Exact can be held to be bound by the CBA. The Court agrees with plaintiffs' position, but for reasons other than the reason plaintiffs advance.

■ As the Third Circuit explained in *Stardyne, Inc. v. NLRB,* 41 F.3d 141 (3rd Cir.1994), "if two entities are found to be alter egos, a collective bargaining agreement covering one entity is automatically deemed to cover the other." *Id.* at 145 (citing *Howard Johnson Co. v. Detroit Local Joint Executive Bd. Hotel & Restaurant Employees,* 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974) (emphasis added)). Commenting on legal implications resulting from the existence of alter ego status between corporations, the Supreme Court in *Howard Johnson* explained that

> [s]uch cases involve mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management. In these circumstances, the courts have had little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor ...

417 U.S. at 259 n. 5, 94 S.Ct. 2236 (citations omitted). And while the *Howard Johnson* Court was only addressing the

---

12. The Court also rejects defendants' argument that Exact cannot be an alter ego of OBR because Exact does not qualify as an employer as defined by the ERISA. Interestingly, defendants cite no authority for this proposition, and as plaintiffs point out, in the cases where alter ego liability has been found, the Courts did not deem it necessary to even address the issue. Moreover, accepting defendants' position would undermine the purpose underlying the alter ego doctrine, *see* supra at ——, by permitting signatories to CBAs to establish sham entities that do not technically qualify as employers under the ERISA and thereby avoid the obligations imposed by CBAs.

alter ego doctrine in the successor corporation context, it is clear that the doctrine has equal application to parallel entities. *R.C. Tile*, 353 F.3d at 959. Moreover, as noted above, although the Court in *Howard Johnson* indicated that the alter ego doctrine has been employed "frequently to avoid the effect of the labor laws . . .," 417 U.S. at 259 n. 5, 94 S.Ct. 2236, the Circuit Court made clear in *R.C. Tile* that in this Circuit "[a]nti-union animus may be a reason one entity should be deemed the alter ego of another for the purpose of assigning liability under ERISA, but the absence of anti-union animus certainly does not establish that the two entities are not alter egos." 353 F.3d at 900.

Thus, the Court's finding that Exact is the alter ego of OBR automatically imposes OBR's obligations under the CBA on Exact. Although the Court has been unable to locate any District of Columbia Circuit cases that have explicitly stated what the Third Circuit held in *Stardyne* regarding automatic liability under a CBA attaching to non-signatory entities found to be alter egos of signatory entities, 41 F.3d at 141, this is exactly what the Circuit Court did in *R.C. Tile*, 353 F.3d at 953 (citing *Belmont*, 139 F.3d at 309); *see also, Flynn v. Thibodeaux Masonry, Inc.*, 311 F.Supp.2d 30 (D.D.C.2004). Accordingly, the Court holds that Exact is required to make the employee contributions to the Fund as agreed to by OBR when it entered into the CBA that is the subject of this dispute.

**D. Damages**

■ Plaintiffs contend that they are entitled to an award of $460,215.20 [13], which includes the delinquent payments [14] and interest as of the date of the filing of

their summary judgment motion (June 30, 2003). On the other hand, defendants argue that it's entitled to a set-off because in addition to paying its employees' salaries, it also paid their health insurance, which is a "benefit that union workers . . . ordinarily receive from the union, funded by contributions to the union's pension fund." Defs.' Opp'n at 40. Defendants therefore opine that additional evidence must be submitted to the Court before a damage award may be made.

Defendants' position conflicts with the law of this Circuit, *see R.C. Tile*, 353 F.3d at 960–61, the position taken by the Supreme Court in an analogous situation, *see Walsh v. Schlecht*, 429 U.S. 401, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977), and other Circuits that have addressed the subject, *see O'Hare v. General Marine Transport Corp.*, 740 F.2d 160, 170 (2nd Cir.1984); *Brogan v. Swanson Painting Co.*, 682 F.2d 807, 809 (9th Cir.1982); *Audit v. Rolfson*, 641 F.2d 757, 761 (9th Cir.1981); *Local 9, International Union of Operating Engineers, AFL–CIO*, 458 F.2d 1313–16 (10th Cir.1972). In *R.C. Tile*, the alter ego employer argued that it should not be required to make the employee contributions as called for in the CBA because it "was required by California law to, and did, pay its non-union employees 'prevailing wages (which is the same as union scale wages, including trust fund contributions.).' " 353 F.3d at 960–61. Rejecting the employer's argument, the District of Columbia Circuit commented that "[e]ven assuming the truth of that assertion . . . such payments do not absolve [the employer] of its obligations to make contributions to the Fund pursuant to the CBA." *Id.* (citations omitted). Thus, the Circuit Court held that

---

**13.** Presumably the amount is now greater due to an increase in the amount of interest plaintiffs are entitled to receive because of the delay in resolving the motion.

**14.** Defendants do not challenge the accuracy of the amount of the delinquent payments alleged by plaintiff. *See* Defs.' Opp'n at 40–41.

"[p]ayments made to non-union employees in lieu of contributions to the Fund do nothing to remedy the harm to the Fund from the non-payment of the pension contributions due under the CBA." *Id.* at 961. *See also, Mullins v. Kaiser Steel Corp.,* 642 F.2d 1302, 1310–11 n. 8 (D.C.Cir.1980), rev'd on other grounds, 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982). The Court must therefore reject Exact's position that it is entitled to a set-off.

### III. *Conclusion*

Based upon the compelling evidence offered by plaintiffs, the Court concludes that Exact is the alter ego of OBR. This conclusion automatically binds Exact to the terms of the collective bargaining agreement to which OBR is a signatory. And, because Exact is not entitled to a set-off for payments it has made to its employees that would otherwise have been made to the Fund as employee contributions pursuant to the terms of the collective bargaining agreement, summary judgment is entered against defendants for the amount of contributions defendants were obligated to make pursuant to the collective bargaining agreement, plus any interest payments plaintiffs are entitled to receive.[15]

**SO ORDERED** on this 7th day of May, 2004.[16]

15. The Court is unsure whether the amount calculated in plaintiffs' papers and their proposed order accurately reflect the current amount they are entitled to recover, as it has been ten months since those calculations were made. Plaintiffs' counsel shall therefore advise the Court and opposing counsel of the amount of the award plaintiffs are currently entitled to receive, consistent with this Opinion, within ten days from the date of the issuance of this Opinion. Defendants' will have five days thereafter to note any objection to the amount requested.

Plaintiffs' counsel may also submit for the Court's consideration requests for the award of attorneys' fees and costs within twenty days from the date of the issuance of this Opinion.

### AMENDED ORDER

In accordance with the Memorandum Opinion that accompanies this Order, it is on this 7th day of May, 2004, hereby

**ORDERED** that summary judgment is issued for the plaintiffs. It is further

**ORDERED** that a monetary award consistent with the Court's Memorandum Opinion shall be entered by the Court following the parties' submissions concerning what amount plaintiffs are entitled to recover.[1]

Such requests shall be supported by proof of the fees and costs plaintiffs are seeking to have the Court award. Defendants may file an opposition to such requests within ten days after any such requests are submitted by the Court. Plaintiffs may then file a reply to any opposition that may be filed by the defendants.

16. A separate Order consistent with this Opinion is also being issued by the Court.

1. The Court reserves a ruling on whether plaintiffs are entitled to an award of attorneys' fees and costs pending the submission of requests for the award of such fees and costs by plaintiffs.